**Teresa De Jesus CASTILLO-VILLAGRA, et al.,
Petitioners,**

v.

**IMMIGRATION AND
NATURALIZATION SERVICE,
Respondent.**

No. 90–70618.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Nov. 8, 1991.

Decided July 27, 1992.

---

James R. Mayock and Nora Privitera, Crosland, Strand, Freeman & Mayock, San Francisco, Cal., for petitioners.

Allen Hausman and Stewart Deutsch, Office of Immigration Litigation, U.S. Dept. of Justice, Washington, D.C., for respondent.

Before CHOY, NORRIS and KLEINFELD, Circuit Judges.

## OPINION

KLEINFELD, Circuit Judge:

This case turns on the breadth of the doctrine of administrative notice. We grant a petition for review of a decision of the Board of Immigration Appeals and reverse, because the Board improperly took notice of the effect of the change of government in Nicaragua on whether petitioners' fear of persecution was well-founded.

Teresa de Jesus Castillo–Villagra and her two adult daughters unsuccessfully sought asylum. They claimed that they had a well-founded fear of persecution by the Sandinistas because of their anti-Sandinista political opinions. While their case was pending, Violeta Chamorro, a democrat, was elected president of Nicaragua, and her democratic coalition, UNO, defeated the Sandinistas in an election. The Board of Immigration Appeals took administrative notice of the election and determined that because the Sandinistas had lost, the threat to petitioners from the Sandinistas had disappeared.

Petitioners were given no notice or opportunity to be heard regarding whether notice should be taken or whether the political changes in Nicaragua obviated their fear of returning. They claim that the Sandinistas retain enough power so that they still need asylum. Despite the election of the new president and parliamentary majority, the Sandinistas retained control of the army and the police, according

to the State Department Country Report. Joint Comm. on Foreign Affairs, *Country Reports on Human Rights for 1990*, S.Rpt. 102–5, 102d Cong., 1st Sess. 701 (1991). The hearings were in December 1987, and February 1988, the Immigration Judge rendered his decision in February 1988, and the briefing on appeal before the BIA was completed in October 1989, all prior to the election, so no one had occasion to develop a record about the possibility that the Sandinistas might someday lose control. The election, with its surprise result in favor of UNO and Chamorro, was in April 1990. The BIA issued its decision in October 1990, without inviting supplementation of the record or briefs, yet based entirely on the election result subsequent to the record and briefs.

We determine that the Board should not have resolved the question of the effect of the change of government on petitioners without giving them notice of its intent to do so and an opportunity to show cause why notice should not be taken, or the record supplemented by further evidence. For these reasons, we reverse.

## I. FACTS

The petitioners entered the United States without inspection, conceded deportability, and sought asylum under section 208 and withholding of deportation under section 243(h). 8 U.S.C. §§ 1158(a), 1253(h). They claim to have been members of a political group, the Movimiento Democratico Nicaraguense (MDN), which opposed the Sandinista regime in Nicaragua.

The State Department Country Report for Nicaragua for 1984 (petitioners apparently left in 1983) explains how the then relatively new Sandinista regime sought to "intimidate the remaining opposition." Joint Comm. on Foreign Affairs, *Country Reports on Human Rights for 1984*, S.Rpt. 99–6, 99th Cong., 1st Sess. 609 (1985). The Sandinista methods of exercising power described by the State Department report and by the petitioners in their testimony give plausibility to petitioners' claims that the threat of Sandinista political persecution might have survived the election.

According to the State Department, the Sandinistas "rely on organizations controlled by the Sandinista National Liberation Front, such as the ubiquitous 'block committees,' to help implement their policies at the local level and exert control, instill loyalty and to identify and implement sanctions against suspected opponents. Using both its own powers and intimidation by Sandinista organizations, the Government systematically harassed opposition political parties...." *Id.* The government used as its intelligence and security network, not only government agencies, but also "Sandinista party organizations." *Id.* at 614. The Sandinista Defense Committees are party organizations, not government agencies, which act in "most neighborhoods ... as a network of informers and as an instrument of pervasive political control and intimidation." *Id.* at 615. These party committees control ration cards for basic necessities. "People who criticize the 'revolutionary process' or its leadership may be subjected to pressure ranging from public ridicule and defacement of their homes by Sandinista mobs to loss of employment and even detention. There have been reports that members of the Sandinista youth group have denounced teachers for their political views, whereupon the teachers have been fired." *Id.* The government "took no responsibility" for actions by Sandinista mobs to intimidate critics of the regime, although when it found it in its interest, the government demonstrated an ability to stop mob activity for public relations purposes. *Id.*

According to the State Department, Sandinista control of education was exercised only partly by the government, by limiting academic freedom and imposing "curricula with a strong ideological content." *Id.* at 617. The party used extragovernmental power as well. "The Sandinista youth organization is a pervasive influence in the public educational system, and has reportedly paid for some members' tuition in private schools in order to have the organization represented there. Sandinista youth members allegedly have denounced teachers for not supporting the Government."

*Id.* The power of the extragovernmental organizations was augmented by government regulation requiring school administrators to work with the "mass organizations," in workshops for evaluation and training. Department of State, *Human Rights in Nicaragua under the Sandinistas* 228 (1986). To assure that high school students would join the party's youth organization, the Sandinista National Liberation Front had the Sandinista Youth–July 19 organization consolidate the Sandinista Children's Association prior to secondary school. *Id.* The teachers' union prepared lists of schoolteachers who did not agree with party positions, and dissenting teachers were afraid to express their views in union meetings. *Id.*

At the hearing before the Immigration Judge, the older daughter, Maria Auxiliadora Aleman–Castillo, provided most of the testimony, because she spoke English. She said that in her small town, Jinotega, "everybody knows everybody's activities," and at the university, everybody knew who was anti-government. Maria testified that "we used to print out papers against the government" and "go to different schools and give them away to people." Both daughters and their mother were active in the MDN.

Maria testified, "if we come back we're gonna be incarcerated, we're gonna be persecuted, we're probably gonna disappear like our friend did...." Because of the family's political opinions and activities, mobs of 20 to 50 people, who "used to live on the streets doing nothing" and had been given good government jobs and cars by the Sandinistas, stoned their house in Jinotega about 10 times, mostly in 1982. They also displayed an effigy in a context in which it was a death threat. She said: "We couldn't call the police because they were the police." All of their windows were knocked out. She was arrested once, together with her younger sister, Teresita, in an anti-government demonstration in Nandaime Carazo in 1982, held in jail about seven hours, and then released with a threat that the next time they would not get out for twenty years. Maria once brought food and medicine to a location for delivery to the Contras. The only way to get a ration card for food and clothing was "to organize in a different movements [sic] that they have ... the government had." The family got out in September 1983. The evidence at the hearing included a newspaper clipping about the friend who disappeared, the brother of Maria's best friend, who was active in the same political movement as Maria and her family. Teresita, Maria's younger sister, refused to join July 19, the Sandinista youth group, and was in charge of the youth propaganda part of her MDN unit.

In his oral decision, the Immigration Judge found that the mother was lying and none of the three had a well-founded fear of persecution because of their political opinions. He noted that the mother's application said her arrest was at her home, but Teresita placed the arrest at a demonstration. The rock throwing and other actions of the "so-called mobs" did not amount to persecution. He was not persuaded that the MDN was "a subversive group bent on the violent overthrow of the government" so he saw no likelihood that the sisters would be persecuted for their affiliation with it, especially since they were quickly released after their arrests. He doubted that they were active in the MDN at all because of lack of documentary corroboration. The Immigration Judge believed that if they returned to Nicaragua and "simply went about their business without more," the government would not persecute them, although "[i]f they decided to get involved in demonstrations or distributing literature, perhaps they would be harassed." He therefore found that they were not entitled to asylum.

■ The Board of Immigration Appeals did not review the Immigration Judge's credibility determination, nor did it consider whether asylum could properly be denied if petitioners could avoid persecution by refraining from political activities. Instead, it resolved this case, along with a number of others involving anti-Sandinista Nicaraguans, by taking administrative notice that an anti-Sandinista coalition now controlled the government and Violeta Chamorro had

been elected president, so anti-Sandinistas had nothing more to fear, whether they previously had a well-founded fear or not. Our review is limited to the BIA decision, and we may not base our decision upon the IJ's findings and decision independently of the BIA decision. *Castillo v. INS*, 951 F.2d 1117, 1120–21 (9th Cir.1991).

The Board issued its decision using language identical to that used in a large number of other cases before it involving anti-Sandinista Nicaraguans:

> After careful review of the record, we find no basis to support the respondent's contention that they have a well-founded fear of persecution

> . . . .

> In this regard, we take administrative notice that the Sandinista party no longer controls the Nicaraguan government. Effective April 25, 1990, a new coalition government, formed by parties in opposition to the Sandinistas ("UNO"), has succeeded the former government of the Sandinista party following national elections and the inauguration of Violeta Chamorro as the new president. Given that the Sandinista party no longer governs Nicaragua, under the present circumstances we do not find that the record now before us supports a finding that the respondents have a well-founded fear of persecution by the Sandinista government were they to return to Nicaragua.

It is plain from its use in the anti-Sandinista Nicaraguan cases that the phrase, "[a]fter careful review of the record," means review to determine whether this case fell into the category of anti-Sandinista Nicaraguan asylum cases, not to determine whether the claim of well-founded fear in the particular case should be accepted. *Cf. Castillo v. INS*, 951 F.2d 1117, 1121 (9th Cir.1991). The Board gave no reasons for its decision except for the facts of which it took administrative notice. The identical language was used in a large number of other cases, apparently as INS form language for Nicaraguan cases after Violeta Chamorro won the Nicaraguan presidential election. Because the BIA decision was based on administrative notice of events after the hearing rather than the evidence introduced at the hearing, and our review is limited to the BIA decision, application of the "substantial evidence" test, *Castillo v. INS*, 951 F.2d 1117, 1120 (9th Cir.1991), amounts to a determination of whether administrative notice was proper.

## II. JURISDICTION AND EXHAUSTION

The INS urges that we lack jurisdiction because petitioners did not move to reopen proceedings after the BIA decision. Its position is that after it denied asylum, petitioners could have moved to reopen on the ground that administrative notice should not have been taken of the effect of the change of government on their well-founded fear, so they cannot raise the matter for the first time in a petition for judicial review of the BIA's determination.

■ Petitioners appeal from a final order of the Board of Immigration Appeals issued September 21, 1990, which denied their requests for asylum. This court has jurisdiction under section 106 of the Immigration and Nationality Act, 8 U.S.C. § 1105a. An alien cannot obtain judicial review until he has exhausted administrative remedies "available to him *as of right* under the immigration laws and regulations." 8 U.S.C. § 1105a(c) (emphasis added). The words "as of right" compel the conclusion that a motion to reopen is not a prerequisite for judicial review.

There is no statutory provision for motions to reopen, so reopening was not available to petitioners "*as of right* under the immigration *laws.*" 8 U.S.C. § 1105a(c) (emphasis added). The applicable regulation, 8 C.F.R. § 3.2, provides that the Board "may" reopen, but contains no nondiscretionary provisions except that motions to reopen "shall not be granted" in certain circumstances. No circumstances are listed in which such a motion must be granted.

The Supreme Court has accordingly held that "[t]he granting of a motion to reopen is thus discretionary," and is "disfavored." *INS v. Doherty*, — U.S. —, —, 112

S.Ct. 719, 724, 116 L.Ed.2d 823 (1992). Since *Doherty* requires that motions to reopen be treated as "discretionary," they cannot be deemed remedies available "as of right," so cannot be a statutory prerequisite to judicial review. A motion to reopen might have been granted as a matter of discretion, but reopening was not available "as of right," so a motion to reopen was not a jurisdictional prerequisite.

Our decision in *Berroteran–Melendez v. INS*, 955 F.2d 1251 (9th Cir.1992), that pendency of a motion to reopen filed after the petition for review did not deprive this court of jurisdiction and did not require a stay of proceedings in the Court of Appeals, is consistent with this analysis. If a reopening were a remedy available "as of right," then we probably would have been compelled to await exhaustion of this remedy before exercising our jurisdiction. In *Berroteran–Melendez*, since the motion to reopen was filed after the petition for review, it follows that no motion to reopen had yet been filed and that the remedy was not exhausted at the time of filing the petition for review, yet we exercised jurisdiction. *Berroteran–Melendez* was a stronger case for declining to exercise jurisdiction than this one, because a motion to reopen had subsequently been filed, and awaited ruling by the INS. *Id.* at 1254–55. From *Berroteran–Melendez* it follows a fortiori that in this circuit, a motion to reopen is not treated as a jurisdictional exhaustion requirement. In *Fayazi–Azad v. INS*, 792 F.2d 873 (9th Cir.1986), we decided the converse of *Berroteran–Melendez*, that when the alien moves to reopen "*before* seeking judicial review, the 'otherwise appealable final order becomes no longer appealable in this court until the motion is denied or the proceedings have been effectively terminated.'" *Id.* at 874 (emphasis in original). The words "otherwise appealable" mean that, had no motion to reopen been filed, the final order would have been appealable.

In *Berroteran–Melendez*, we noted that "unlike a petition for review, which automatically stays the order of deportation, an administrative motion to reopen filed with the BIA does not provide an automatic stay of deportation." 955 F.2d at 1254 n. 2. This means that as a practical matter, the remedy of a motion to reopen may be unavailable, because the petitioner may be deported and the motion may become moot prior to decision. *See* C.F.R. § 3.8(a); *Dhangu v. INS*, 812 F.2d 455, 460 (9th Cir.1987). This practical unavailability of the remedy leads to the same conclusion as the formal analysis above.

Even if jurisdiction is not precluded by the statute, exhaustion of administrative remedies by a motion to reopen may be required as a matter of prudence in order to develop a proper record, prevent deliberate bypass of the administrative scheme, and allow the agency to correct its own mistakes. *Montes v. Thornburgh*, 919 F.2d 531, 537 (9th Cir.1990). Where there are factual questions that the court is not in a position to resolve, and the agency may take action which will render unnecessary consideration by the court of constitutional issues, judicial review awaits a BIA decision on a motion to reopen. *Dhangu*, 812 F.2d at 460–61.

In this case, prudential exhaustion should not be required. The BIA decision makes development of a further record irrelevant, because it is undisputed that the petitioners claim to be anti-Sandinista Nicaraguans, and that was the only fact that mattered. Petitioners did not bypass the INS. The INS bypassed them, by taking administrative notice of facts not at issue in the hearings. Usually in a motion to reopen, the movant seeks to inject new material, but in this case, the tribunal injected the new material after the hearing was over. The agency apparently has taken its position in a large number of Nicaraguan anti-Sandinista cases, so would be unlikely to change its position on account of one or another motion to reopen. We would needlessly clog the agency docket were we to stay and remand for motions to reopen. The prudential exhaustion requirement does not apply where it would be futile. *El Rescate Legal Services v. EOIR*, 959 F.2d 742, 747 (9th Cir.1992).

The appropriate analogy to a motion to reopen in an INS case is a motion for a new trial based on newly discovered evidence in a criminal case. *INS v. Abudu*, 485 U.S. 94, 110, 108 S.Ct. 904, 914, 99 L.Ed.2d 90 (1988). *Abudu* teaches that the "heavy burden" upon the moving party seeking a second trial should not be imposed where there has not been a first trial. *Id.* at 110, 108 S.Ct. at 914. The BIA decision was made on the basis of facts which were not the subject of the hearing before the IJ. That means that, with respect to the facts which controlled the BIA decision, the petitioners have never had a hearing. The motion to reopen is discretionary. If it were denied, the petitioners would never obtain a hearing on the matters which were determinative for the BIA. The effect of requiring a motion to reopen as a condition of exhaustion may amount, in practical consequences, to denial of any hearing.

We recognize that the Eleventh Circuit takes a contrary view. In *Garcia–Mir v. Smith*, 766 F.2d 1478 (11th Cir.1985), *cert. denied*, 475 U.S. 1022, 106 S.Ct. 1213, 89 L.Ed.2d 325 (1986), the motion to reopen is treated as jurisdictional under 8 U.S.C. § 1105a(b), "[b]ecause the regulations give the alien a right to reopen for presentation of new evidence...." *Id.* at 1486 (dictum). The Fifth and Sixth Circuits may take the same position. *Rivera–Cruz v. INS*, 948 F.2d 962, 968–969 (5th Cir.1991); *Dokic v. INS*, 899 F.2d 530 (6th Cir.1990). Both these decisions came down before the Supreme Court's decision in *Doherty*. In our view, *Abudu* and *Doherty* cut the other way. The alien does not have a right to reopen, only a right to ask for reopening, and the motion is disfavored and addressed to the discretion of the agency. Since a motion to reopen is like a motion for new trial in a criminal case because of newly discovered evidence, it is not correct to say that the regulations "give the alien a right to reopen for presentation of new evidence...." *Garcia–Mir* at 1486. Prudential exhaustion applies in many factual settings even where the statutory exhaustion requirement does not, but in the case at bar, it is not fair to condition judicial review upon a motion to reopen. The BIA has already passed on the issue once, it has full discretion to deny "disfavored" motions to reopen, and the petitioners may be deported in the meanwhile.

## III. ADMINISTRATIVE NOTICE

Petitioners' attorney explained that they had no quarrel with the BIA's taking notice that Violeta Chamorro had won election to the presidency, and that the UNO, a non-Sandinista coalition, had won a majority in parliament. Their claim is that the Sandinistas retain control of the police and the army, and still have sufficient sway to persecute their political adversaries, who include petitioners. The record, both the testimony by petitioners about the Sandinistas' use of street mobs, arrests, Sandinista movement control of ration cards and promotions, and the State Department Country Report, allows for the plausibility of petitioners' claim.

### A. APA or INA?

■ To decide whether administrative notice was appropriate, first we must decide whether the question should be analyzed under the Administrative Procedure Act or the Immigration and Naturalization Act. The petitioners argue that the Administrative Procedure Act ("the APA"), ch. 324, 60 Stat. 237 (1946) (codified as amended at 5 U.S.C. §§ 551–706) bars administrative notice in the circumstances of this case. The APA provides that no subsequent statute shall be deemed to modify it "except to the extent that it does so expressly." 5 U.S.C. § 559. Section 242(b) of the Immigration and Nationality Act of 1952 ("the INA"), ch. 477, 66 Stat. 163, 209 (codified as amended at 8 U.S.C. § 1252(b)) sets out in some detail the procedural framework governing deportation proceedings, and provides that "[t]he procedure so prescribed shall be the sole and exclusive procedure for determining the deportability of an alien under this section." We conclude that the INA displaces the APA on this question, so we do not analyze the administrative notice issue under the APA.

The exclusivity provision of the INA, 8 U.S.C. § 1252(b), was construed in *Marcello v. Bonds*, 349 U.S. 302, 75 S.Ct. 757, 99 L.Ed. 1107 (1955), to "exclude the application of the Administrative Procedure Act." *Id.* at 309, 75 S.Ct. at 761. In the case at bar, the alien concedes deportability, so *Marcello* arguably is not dispositive.

The petitioners cite *Escobar Ruiz v. INS*, 838 F.2d 1020 (9th Cir.1988) (en banc), for the proposition that the APA governs deportation proceedings. In *Escobar Ruiz*, we held that the Equal Access to Justice Act, 28 U.S.C. § 2412(d)(1)(A), applied to deportation proceedings. We construed *Marcello* to mean that "immigration proceedings are covered by the APA," except that "when the two statutes diverge, the more specialized hearing provisions of the INA govern." *Id.* at 1025.

Subsequently, the Supreme Court decided in *Ardestani v. INS*, — U.S. —, 112 S.Ct. 515, 116 L.Ed.2d 496 (1991), that the Equal Access to Justice Act did not apply to deportation proceedings. Our decision in *Escobar Ruiz* has been overruled by *Ardestani*. Part of the ratio decidendi in *Ardestani* was that "immigration proceedings ... are not governed by the APA." *Id.* — U.S. at —, 112 S.Ct. at 518. Our narrower reading of *Marcello* was rejected. In light of *Ardestani*, we must analyze the administrative notice issue under the INA, not the APA.

**B. Proper Scope of Notice.**

■ Notice is a way to establish the existence of facts without evidence. In federal courts, notice may be taken of facts relating to the particular case, though no evidence is introduced, where the fact is "not subject to reasonable dispute," either because it is "generally known within the territorial jurisdiction," or is "capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." Fed.R.Evid. 201(b); *see* 9 John Henry Wigmore, *Evidence*

§ 2571, at 731–32 (J. Chadbourn rev. 1981). Thayer saw notice more as a branch of the theory of knowledge, or law in general, than the law of evidence, because "[i]n conducting a process of judicial reasoning, as of other reasoning, not a step can be taken without assuming something which has not been proved...." James B. Thayer, *A Preliminary Treatise on Evidence* 279 (1898). Neither judges nor jurors need check their knowledge and experience of life at the courthouse door.[1]

■ The appropriate scope of notice is broader in administrative proceedings than in trials, especially jury trials. *Banks v. Schweiker*, 654 F.2d 637 (9th Cir.1981). Partly this is because the rules of evidence are more liberal and the volume of cases is so much greater in administrative proceedings. *Id.* at 640. Professor Kenneth Culp Davis distinguished between adjudicative facts, which are those concerning the immediate parties, and legislative facts, which help the tribunal determine law and policy and are ordinarily general facts not concerning the immediate parties. Kenneth Culp Davis, *Judicial Notice*, 55 Colum.L.Rev. 945, 952 (1955). Davis' argument that notice of legislative facts may properly be taken more liberally than notice of adjudicative facts generally has been accepted. *See, e.g.*, Fed.R.Evid. 201 advisory committee's notes on 1972 proposed rules.

While in proceedings in court notice is quite restricted for adjudicative facts, it is broader in administrative proceedings. A case before an administrative agency, unlike one before a court, "is rarely an isolated phenomenon, but is rather merely one unit in a mass of related cases ... [which] often involve fact questions which have frequently been explored by the same tribunal." Walter Gellhorn, *Official Notice in Administrative Adjudication*, 20 Tex. L.Rev. 131, 136 (1941). The tribunal learns

---

1. In a case for the sale of intoxicating liquor, a court properly refused a defense request for an instruction requiring the prosecution to prove that gin was intoxicating liquor, because "everybody who knows what gin is, knows not only that it is a liquor, but also that it is intoxicating.... No jury can be supposed to be so ignorant as not to know what gin is." *Id.* at 297 n. 1 (quoting *Com. v. Peckham*, 2 Gray 514).

from its cases.[2] Moreover, volume and repetition affect peoples' ability to pay attention. Because of the quantity of similar cases before an agency such as the INS, if notice is not taken more broadly in administrative hearings, litigants may have an uphill battle maintaining the attention of the administrative judges. Even if the law allows people to tell officials the exact same and obvious thing hundreds of times, the officials may find it very hard to listen attentively after the first dozen or two repetitions. Hearings may degenerate into an empty form if the adjudicators cannot focus attention upon what is noteworthy about the particular case. The broader notice available in administrative hearings may, if properly used, facilitate more genuine hearings, as opposed to "hearings" in which the finder of fact hears, but cannot, because of the repetition, listen.

But the administrative desirability of notice as a substitute for evidence cannot be allowed to outweigh fairness to individual litigants. Unregulated notice, even of legislative facts, gives finders of fact "a dangerous freedom." Peggy C. Davis, *There Is A Book Out ...: An Analysis of Judicial Absorption of Legislative Facts*, 100 Harv.L.Rev. 1539, 1541 (1987). Notice of facts without warning may deny "the fair hearing essential to due process," and amount to "condemnation without trial." *Ohio Bell Telephone Co. v. Public Utils. Comm'n*, 301 U.S. 292, 300, 57 S.Ct. 724, 729, 81 L.Ed. 1093 (1937).[3]

The facts of which the INS took notice in this case were in part legislative in nature. They included: (1) that Violeta Chamorro had been elected president, (2) that her non-Sandinista coalition had gained a majority in parliament, and (3) that the Sandinistas were ousted from power. The facts were also in part adjudicative, that the Castillo–

Villagra family had nothing more to fear from the Sandinistas. The first two facts are plainly legislative and not debatable. It would be a waste of time to allow evidence regarding them. The third legislative fact, that the Sandinistas were ousted from power, was debatable, since the Sandinistas retained power over the police and the military. The adjudicative fact required both a debatable assumption about the amount of power retained by the Sandinistas, and an assumption about the particular salience of the Castillo–Villagra family as an irritant to Sandinistas who may retain enough power in Jinotega or the university to persecute them.

The question of proper scope and manner of administrative notice before the INS is one of first impression in the Circuit. We decided upon a somewhat analogous question in *Banks v. Schweiker*, 654 F.2d 637 (9th Cir.1981), although *Banks* is not controlling in this case because it arose in a social security context in which the APA and social security regulations applied. The reasoning in *Banks*, however, is applicable here, and we see no reason to choose a different path for INS cases.

In *Banks* we held that an adjudicator could properly take notice of how social security office personnel ordinarily dealt with inquiries such as Banks had made, as a basis for rejecting Banks' testimony as not credible. We rejected for administrative proceedings the applicability of the principle in Federal Rule of Evidence 201(b), that adjudicative facts may be noticed only if "not subject to reasonable dispute," and rejected in the administrative context the tradition of caution associated with taking notice under that rule. Instead, we adopted "a rule of convenience," that "the ALJ should take notice of adjudicative facts, whenever, 'the ALJ at the

---

2. Gellhorn speaks of the facts learned from repetitive litigation, as when an Officer of the Bureau of Marine Inspection and Navigation knows that pier 45 in San Francisco points toward Alcatraz Island, a ship will make a broad sweep to the left to pass under the bridge, and the current is south-westerly at a certain time. If a witness testifies to the contrary, *the officer* knows the testimony is false. *Id.* at 138.

3. Thayer's formulation cannot be improved upon, "[t]he function is, indeed, a delicate one; if [the doctrine of judicial notice] is too loosely or ignorantly exercised it may annul the principles of evidence and even of substantive law. But the failure to exercise it tends daily to smother trials with technicality, and monstrously lengthens them out." Thayer, *supra*, at 309 (footnote omitted).

hearing knows of information that will be useful in making the decision.' " *Id.* at 640–41 (quoting 3 Kenneth Culp Davis, *Administrative Law Treatise* § 15:18, at 200 (2d ed. 1980)).

The justifications for a rule of convenience apply equally in the INS context. The agency has a large volume of cases. Its officers work in a specialized area with many similar cases, so they grow familiar with conditions abroad from many witnesses and exhibits. The burden of producing evidence may be especially great when it involves changing political conditions in a foreign country. The repetitiveness of such evidence, as large numbers of petitioners from particular countries pass through the system, may interfere with its heuristic power. It is significant for the scope of notice that the asylum seeker has the burden of proof. Where the asylum seeker is given the opportunity to offer evidence rebutting the proposition of which notice is taken, notice does not substitute for evidence which the agency would otherwise have to produce. Instead, it directs the asylum seeker's presentation to the propositions likely to have a practical effect on the outcome.

The problem arises, in this case as in *Banks*, when the petitioner is denied a fair opportunity to rebut the proposition of which notice is taken. An essential concomitant of a rule of convenience is a fair opportunity to respond. "When the rule of convenience is applied to allow wide latitude, however, it is essential that the parties be afforded an opportunity to present information 'which might bear upon the propriety of noticing the fact, or upon the truth of the matter to be noticed.' " *Banks* at 641 (quoting C. McCormick, *Law of Evidence* § 333, at 771 (2d ed. 1972)). In *Banks*, and in this case, the petitioners

were not given a fair opportunity to be heard. They might have been able to show either that the conditions affecting them in Nicaragua were too complex, unsettled and particularized for notice to be appropriate, or that their political enemies retained sufficient power in the country, Jinotega or the university to give rise to a "well-founded fear."

■■■ There are three separable issues with regard to notice: (1) whether notice may be taken at all, (2) whether warning must be given before notice is taken, and (3) whether rebuttal evidence must be allowed against the proposition of which notice is taken. The distinctions between legislative and adjudicative facts, and between facts generally known and those known only to some, used in Federal Rule of Evidence 201, are but factors to be weighed in the administrative context.

■■■ Because of the multidimensional nature of administrative notice decisions, the only practical solution is to give the agency discretion, subject to review for abuse of discretion, not only for whether to take notice, but also for whether to allow rebuttal evidence and even for whether the parties must be notified that notice will be taken. The Fifth Circuit has determined that INS taking of administrative notice is reviewed for abuse of discretion, *Rivera–Cruz v. INS*, 948 F.2d 962, 966 (1991), and so do we.[4] It is not necessary to warn that administrative notice will be taken of the fact that water runs downhill. Some propositions, however, may require that notice not be taken, or that warning be given, or that rebuttal evidence be allowed. The agency's discretion must be exercised in such a way as to be fair in the circumstances.[5]

---

**4.** We review a district court's determination to take judicial notice under Federal Rule of Evidence 201 for abuse of discretion and see no reason to apply a different standard to an agency's determination to take administrative notice. *Peabody v. Maud Van Cortland Hill Schroll Trust,* 892 F.2d 772, 777–78 (9th Cir.1989), *cert. denied,* 496 U.S. 937, 110 S.Ct. 3216, 110 L.Ed.2d 663 (1990).

**5.** In evaluating whether discretion was abused a court may find a useful a number of factors formulated by Professor Davis. These include whether the facts at issue are: (1) narrow and specific or broad and general; (2) central or peripheral; (3) readily accepted or controversial; (4) purely factual or mixed with judgment, policy or political preference; (5) readily provable or provable only with difficulty or not at all; or, (6) facts about the parties or facts or

The agency would not have to accord any opportunity to the applicants to offer evidence to rebut the propositions that Chamorro won the election and that UNO won a majority in parliament, since those facts are legislative, indisputable, and general. The agency should have warned that it would consider these facts even though they were not in existence at the time of the hearing and appellate briefs, so that the parties could have moved for leave to supplement their briefs, supplement the evidence, withdraw their applications for asylum, or seek other relief. The agency should also have warned, prior to final decision, that it intended to take notice that the Sandinistas were out of power, and that any well-founded fear of persecution the applicants might have had before the election could no longer be well-founded, and then given the parties an opportunity to show cause why notice should not be taken of these propositions. Depending on the showing made, fairness might or might not have required that the parties be allowed to present evidence on these propositions.

It may be that, were the petitioners given an opportunity to respond to the INS view of the effect of the change in government, they could make no case for a well-founded fear. Maria's application asks for "the opportunity to stay in this country until the situation changes in our own." Aliens from different parts of the country or with different histories might have different and particularized situations, with respect to fear of persecution in post-election Nicaragua. But the agency should not have assumed away petitioners' case.

To deny an opportunity to be heard in these circumstances was a denial of Due Process required by the Fifth Amendment. It is well established that deportation proceedings must conform to the requirements of the Fifth Amendment Due Process Clause, and that these requirements are satisfied by "a full and fair hearing." *Ramirez v. INS*, 550 F.2d 560, 563 (9th Cir.1977). This may require advice that the agency intends to take notice of certain facts and an opportunity to respond. *Ohio Bell*, 301 U.S. at 306, 57 S.Ct. at 731; *Banks*, 654 F.2d at 641. The availability of a motion to reopen was not adequate, because the agency might have denied it, and deportation would not have been automatically stayed by the motion. The Board erred in taking notice of the change of government without providing the petitioners an opportunity to rebut the noticed facts.

We recognize that other circuits have resolved this question somewhat differently. *Kaczmarczyk v. INS*, 933 F.2d 588 (7th Cir.), *cert. denied,* — U.S. —, 112 S.Ct. 583, 116 L.Ed.2d 608 (1991), holds that, for a Polish Solidarity worker, the INS could properly take notice that Solidarity had joined the ruling coalition so its supporters were no longer being persecuted. The court took notice that, by the time the appeal was decided, the Communist Party had been excluded from the government. This is consistent with our decision, that the INS could properly take notice that the Sandinistas had lost the presidency and their parliamentary majority. The Seventh Circuit reaches the same conclusion, that due process requires that the applicant be allowed an opportunity to rebut, that we do:

> We believe the due process clause of the fifth amendment requires that petitioners be allowed an opportunity to rebut officially noticed facts, particularly when, as in this case, those facts are crucial to—indeed dispositive of—the outcome of the administrative proceeding.

> .    .    .    .    .

> We note, finally, that *not* to allow petitioners an opportunity to rebut noticed facts would sanction the creation of an unregulated back door through which unrebuttable, non-record evidence could be

unrelated to them. Kenneth Culp Davis, *Facts in Lawmaking*, 80 Colum.L.Rev. 931, 932 (1980) (also see Davis, *Judicial Notice*, 55 Colum.L.Rev. at 977). These factors, as well as any others as may be appropriate, provide useful guidance to a court conducting an inquiry regarding an agency's abuse of discretion.

introduced against asylum petitioners outside of the statutorily-mandated hearing context, see 8 U.S.C. § 1252(b). *Id.* at 596 (emphasis in original). Also see *Rivera–Cruz v. INS*, 948 F.2d 962 (5th Cir.1991); *Janusiak v. INS*, 947 F.2d 46 (3d Cir.1991); *Wojcik v. INS*, 951 F.2d 172 (8th Cir.1991); *Kapcia v. INS*, 944 F.2d 702 (10th Cir.1991).

The cases affirming the INS in these change of government cases, where administrative notice was taken, generally agree with the proposition that the asylum seeker is constitutionally entitled to present information which might rebut the proposition of which notice was taken, but assume that this could be done in the context of a motion to reopen, if it was not already done. For example, *Kaczmarczyk* and we diverge, where *Kaczmarczyk* states that the petitioner must first move to reopen before the INS, and although the INS could moot out the motion to reopen by deporting the applicant before ruling, "[w]e presume ... the Board will exercise its discretion to stay the execution of its decision until it has had an opportunity to rule on the applicant's motion." *Id.* at 597 n. 9. We are not satisfied that we can make this presumption, in view of the "broad discretion" the agency has to deny motions for rehearing, which are "disfavored." *INS v. Doherty*, —— U.S. ——, ——, 112 S.Ct. 719, 724, 116 L.Ed.2d 823 (1992).

In the case at bar, the applicants had a plausible claim that they might still have a well-founded fear of persecution despite the Chamorro election. The record they developed before the election allowed for the conclusion that Nicaragua had been dominated by the Sandinista party, and that Sandinista power flowed from the party, not just from the government. It may be that the party's permeation of society enables it to persecute opponents, even with the presidency and some departments of government in other hands. Perhaps the Nicaraguan government is not so strong and hierarchical as to render impotent any political movement which does not control the presidency. In some forms of political organization, a party may be more powerful than the formal government:

What strikes the observer of the totalitarian state is certainly not its monolithic structure. On the contrary, all serious students of the subject agree at least on the co-existence (or the conflict) of a dual authority, the party and the state.... It has also been frequently observed that the relationship between the two sources of authority, between state and party, is one of ostensible and real authority, so that the government machine is usually pictured as the powerless facade which hides and protects the real power of the party.

Hannah Arendt, *The Origins of Totalitarianism* 395 (1958).

We take notice, for the limited purpose of determining whether the petitioners' claim is sufficiently plausible so that they should be allowed to present evidence, of the State Department country report on Nicaragua for 1990. Joint Comm. on Foreign Affairs, *Country Reports on Human Rights Practices for 1990*, S.Rpt. 102–5, 102d Cong., 1st Sess. (1991). This report says that the military and police remained under Sandinista control in 1990 despite the election, including the renamed General Directorate of State Security "which was responsible for numerous and significant human rights violations." *Id.* at 701. The report notes continuing "politically motivated killings, some involving members of the security forces, police abuse of detainees," *id.* at 702, violence and killings by Sandinista supporters, and other political persecution similar to what Maria testified about before the election. For example, "[t]hroughout the year, Sandinista mobs (turbas), sometimes joined by the police or army, frequently used forced entry into private homes as a means to intimidate their political opponents. Prominent UNO supporters typically were singled out for these attacks, in which the turbas smashed windows, damaged automobiles and other property, and shouted death threats." *Id.* at 707.[6]

---

**6.** We express no opinion on the allegations made in the State Department report; the report

Of course we suggest no determination as to whether Nicaragua was the kind of regime Hannah Arendt describes above, before or after the election. The point is, the propositions that the Sandinistas retain sufficient power to persecute petitioners, and that the petitioners have a well-founded fear of such persecution should they return to the town of Jinotega or the university in Managua, were seriously debatable, despite the election. Petitioners were never allowed to be heard on these propositions. Is their fear that they will be "disappeared" well-founded, despite the Chamorro election? Will the Sandinistas, because of their control of the police and military, still be in a position to carry out their threat of 20 years imprisonment if the sisters are caught demonstrating against them again? Will their house be stoned by party-orchestrated gangs because of their political opinions? Maybe petitioners' alleged fear of Sandinista persecution was ended by the election. Or maybe one swallow does not make a summer. Aristotle, *Nicomachean Ethics*, book 1, chapter 7. Neither we nor, without opportunity for a hearing, the BIA, can properly say whether applicants have a well-founded fear of persecution by the Sandinistas if they return to Nicaragua.

There was substantial evidence to support the BIA determination that past persecution was not so severe as to merit asylum in the absence of a well-founded fear of future persecution. *Matter of Chen*, Interim Decision 3104 (BIA 1989). Petitioners urge that they are entitled to the benefit of section 104(d)(1), which prevents loss of asylum because of change of circumstances where an alien "was granted asylum," even though they were not granted asylum, because they should have been. We need not reach this issue because of our reversal on administrative notice. Because we reject the use the BIA made of administrative notice, and notice was the

ground for the decision, it is not necessary to reach the remaining issues in the briefs.

We vacate the orders of deportation and remand for proceedings at which the asylum applicants may be heard on the appropriateness of notice and introduce evidence regarding the facts of which notice is taken.

REVERSED AND REMANDED.

---

is relevant only as evidence that the question of the significance of the effect of the change of government in Nicaragua on persecution of persons for political beliefs is controversial. *See, supra*, n. 5 (whether noticed fact is "readily accepted or controversial" is a factor in evaluat-

ing exercise of agency's discretion to take administrative notice). We do not hold that reports of the State Department, or any government agency, are the only means of establishing the plausibility of a petitioner's claim.