**Rosaura GONZALEZ, Rosaura Gonzalez Gallegos; Betty Jeaneth Catuse, Petitioners,**

v.

**IMMIGRATION AND NATURALIZATION SERVICE, Respondent.**

No. 94–70881.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted March 15, 1996.

Decided May 3, 1996.

Lisa Schuh and Clinton J. Elliott, Snell & Wilmer, Phoenix, Arizona, for petitioners.

Pauline Terrelonge and Joseph F. Ciolino, United States Department of Justice, Washington, D.C., for respondent.

Before: THOMPSON and KLEINFELD, Circuit Judges, and WILSON, District Judge.*

KLEINFELD, Circuit Judge:

In this asylum case, the Board of Immigration Appeals (BIA) erred regarding Rosaura Gonzalez Gallegos's petition by taking administrative notice of the effect of political changes in petitioner's country after she left, without giving her a fair opportunity to be heard. We, therefore, grant Gallegos's petition for review and remand the case. We deny Jeaneth Catuse's petition for review.

## FACTS

The petitioners are a mother, Mrs. Gallegos, and her adult daughter, Ms. Catuse, both citizens of Nicaragua. Both petition for review of the BIA's denial of their separate asylum claims, based on fear of persecution by the Sandinistas. The daughter entered the United States almost three years later than the mother, and their histories in Nicaragua are different, so we set out the facts separately. The Immigration Judge (IJ) made an express finding that both petitioners' testimony was "at all times truthful, candid, and forthright," and the BIA made

---

* The Honorable Stephen V. Wilson, United States District Judge for the District of California, sitting by designation.

no express finding on credibility, so we accept as undisputed the facts as testified to by the petitioners. *Singh v. Ilchert*, 63 F.3d 1501, 1506 (9th Cir.1995).

The asylum hearing was held April 27, 1990. The date is significant because Violeta Chamorro won her upset election to the presidency of Nicaragua on February 25, 1990, and took office on April 25, just two days before the hearing. Petitioners sought a continuance of the hearing, but the IJ denied it because the hearing had already been continued several times.

Mrs. Gallegos testified that the Sandinistas had harassed and harmed her and her family because they were anti-Communist and had been supporters and employees of the Somoza government. Her mother was a Somoza party activist, and her stepfather was a judge during the Somoza regime. He did not remain a judge because a bomb exploded in 1988, and he was left a maimed deaf-mute. The Sandinista government took her mother's lands away and gave them to Sandinista combatants. One of her brothers was "incarcerated because he was always speaking about the government. Another brother, he's crazy because they sent him to the service." Her sister-in-law was beaten in public when she objected to her son being drafted. Her previous husband had helped her son escape from the country to avoid the draft and was held prisoner before being released for health reasons.

Mrs. Gallegos had been deprived of a ration card and of freedom to buy goods in the legal market because of her and her family's political beliefs, so she obtained food on the black market at three times the legal price. She worked as a merchant, but was forced to liquidate her business because she was denied the card she would need from the Ministry of Commerce to buy inventory. She then was supported by family members for over a year until she left on July 1, 1985. Despite being put out of business, she testified that she did not leave Nicaragua for economic reasons, stating "we have money."

"Contra" was painted on Mrs. Gallegos's house in 1980. She painted it over, but it was done again in 1983. Then she surrounded the house with iron bars. Government soldiers came to her house in 1981 and told her to "integrate yourself to life, a Sandinista life." Two or three months later they came again and said "it was going to be very bad for me should I not join them."

The woman who headed the official Sandinista neighborhood committee, called the CDS, lived three doors down from Ms. Gallegos. "She told my neighbor that should . . . should we keep on going like that wanting to do nothing we would be disappeared . . . with a bomb." The death threats continued, the last about five months before Mrs. Gallegos left Nicaragua. Mrs. Gallegos saw the CDS chief daily and "had a great fear of her, I was horrified." The CDS chief threatened Mrs. Gallegos to her face, and told her she could have her "disappeared."

Mrs. Gallegos testified that the CDS chief had the power to carry out her threat, but had not as yet done so. Mrs. Gallegos was not arrested and no violence was done to her person.

Mrs. Gallegos testified that she was scared to go back to Nicaragua because she feared that the threats made against her would be carried out. By the time of the hearing in 1990, a relative immigrant visa to the United States had been approved for Mrs. Gallegos, because she had married a United States citizen. Getting it, however, would have required her to return to Nicaragua for administrative processing in the United States Consulate there, and she was not willing to return.

Ms. Catuse, the daughter, left Nicaragua on December 12, 1987, two and a half years later than her mother. While in high school, she became an adherent of the Jehovah's Witnesses, and quite active with the Jehovah's Witness congregation. Because of her religious belief, she refused to comply with the high school requirement that she go out and cut coffee in the mountains. The reason was that students had to wear government uniforms and carry weapons when they cut coffee. As a result of her refusal, she could not get a high school diploma. She became a nurse's assistant, but refused an assignment in the mountains because it also required that she wear a government uniform and

carry a weapon. She left the hospital where she was working as a nurse's assistant and left Nicaragua three or four months later.

The kind of problems she encountered were that when the Jehovah's Witnesses worshiped, Sandinistas would gather outside the Kingdom Hall and call the Jehovah's Witnesses "CIA." Eventually the government took away the Kingdom Hall from the congregation and removed the permit to hold meetings. The government also arrested the male members of the congregation.

After leaving her hospital job, Ms. Catuse supported herself by buying and selling, and lived in various houses, including the house her mother had left her. The government then took the house her mother had left her because Ms. Catuse was not living there when they took a census. "Should my house would have not been taken away from me, I would not have come here."

She had not come to the United States with her mother because "I had no interest in it because I was doing my social services ... that was my job and I liked my job, I had no interest in coming." Her religion created no conflict with the job she was assigned to do, just with wearing the uniform and carrying the weapon. Losing the house was "not the reason" Ms. Catuse left Nicaragua. The reason was that she felt she could not live freely as a Jehovah's Witness, and did not want to be sent into the mountains for national service.

Unlike her mother, Ms. Catuse was never threatened with death on account of her opinions. She did not testify to any threats against her personally. Although the men in her congregation were arrested, the women were not. The reason that she found life as a Jehovah's Witness in Nicaragua unbearable was not, in her description, because of especially oppressive conduct directed by the Sandinistas toward the Jehovah's Witnesses, but rather because her religious beliefs as a Jehovah's Witness made it impossible for her in good conscience to do what other Nicaraguans had to do, carry a gun and wear a uniform.

The IJ denied relief to both women. Although he accepted the evidence that Mrs. Gallegos's life had been threatened, he found "nothing in the record" to support the proposition that the neighborhood CDS chief "had the apparent present ability or any ability whatsoever to make real the threat of disappearance." He inferred absence of danger from the fact that Ms. Gallegos was not killed during the three years she continued to live there. He thought the record insufficiently clear that Mrs. Gallegos's business failed because of political persecution, as opposed to the "well known fact that Nicaragua is an economic mess." As for Ms. Catuse, he analogized her situation to that of a person subject to military conscription, and found an absence of religious persecution because she did not ask whether she could fulfill her service obligation without wearing a uniform and carrying a gun.

The BIA affirmed the IJ's decision denying asylum "for the reasons set forth in that decision," and on independent grounds. The BIA's independent grounds were that the government had changed in Nicaragua, and petitioners "have provided no evidence of any instance in which the Sandinistas, following their removal from power, have harmed or sought to harm them or any other individual in a similar circumstance." Any presumption that past persecution created a likelihood of future persecution was "rebutted by the evidence of changed circumstances in Nicaragua" and "there exists from the record before us no likelihood of persecution in the future in view of the change of government in Nicaragua." "As the respondents have acknowledged this change of government, we do not find any violation of the respondent's due process rights under the reasoning of *Castillo–Villagra v. INS*, 972 F.2d 1017 (9th Cir.1992), in our response. *See Acewicz v. INS*, 984 F.2d 1056 (9th Cir.1993)."

## ANALYSIS

To the extent that the BIA incorporates the IJ's decision as its own, we treat the IJ's statement of reasons as the BIA's and review the IJ's decision. *Alaelua v. INS*, 45 F.3d 1379, 1382 (9th Cir.1995). Except to that extent, our review is confined to the decision of the BIA. *Acewicz v. INS*, 984 F.2d 1056, 1059 (9th Cir.1993). The BIA's

decision denying asylum "must be upheld if 'supported by reasonable, substantial, and probative evidence on the record considered as a whole.' 8 U.S.C. § 1105a(a)(4). It can be reversed only if the evidence ... was such that a reasonable factfinder would have to conclude that the requisite fear of persecution existed." *INS v. Elias–Zacarias,* 502 U.S. 478, 481, 112 S.Ct. 812, 815, 117 L.Ed.2d 38 (1992); *Prasad v. INS,* 47 F.3d 336, 338 (9th Cir.1995).

## A. *Denial of Motion for Continuance.*

■ Petitioners argue that denial of their motion for continuance was an abuse of discretion. The parties had counsel and were prepared to proceed. Multiple continuances had already been granted, and it was hard to predict when conditions in Nicaragua would be stable enough to make a better judgment about what continuing threat the Sandinistas might present. The decision whether to grant a continuance "is in the sound discretion of the trial judge and will not be overturned except on a showing of clear abuse." *Rios–Berrios v. INS,* 776 F.2d 859, 862 (9th Cir.1985). No showing of abuse of discretion has been made.

## B. *Ms. Catuse.*

■ Substantial evidence on the record as a whole supported the denial of Ms. Catuse's application. The basis of her asylum claim was fear of persecution on account of her religion, but the record contained substantial evidence from which the BIA could conclude that she lacked a well founded fear of persecution.

■ The primary harm Ms. Catuse had suffered was being forced into national service where she would have to wear a uniform and carry a gun. Wearing a uniform and carrying a gun was contrary to her conscience because of her religion. However, so far as her testimony indicated, the requirement of uniformed and armed national service was imposed on all young people, not particularly on Jehovah's Witnesses. A general requirement of conscription does not amount to persecution. *Castillo v. INS,* 951 F.2d 1117, 1122 (9th Cir.1991).

The IJ found that Ms. Catuse did not try to ascertain whether she could perform the national service without complying with the uniform and gun requirement, so there was no evidence to determine whether or not the Sandinistas would accommodate religious conscientious objectors. Because of this finding, we need not determine whether the law of this circuit currently treats failure to accommodate conscientious objectors as a basis for a refugee status. *See Canas–Segovia v. INS,* 902 F.2d 717, 726 (9th Cir.1990), *vacated,* 502 U.S. 1086, 112 S.Ct. 1152, 117 L.Ed.2d 401 (1992), *on remand,* 970 F.2d 599 (9th Cir.1992).

■ The remaining evidence must be considered to determine whether "a reasonable factfinder would have to conclude that the requisite fear of persecution existed." *INS v. Elias Zacarias,* 502 U.S. at 481, 112 S.Ct. at 815. We are bound by our established definition of "persecution" as involving the "infliction of suffering or harm":

> In interpreting the Act, the Board is bound by our earlier decisions, which define "persecution" generally as "the infliction of suffering or harm upon those who differ (in race, religion, or political opinion) in a way regarded as offensive." Persecution is an extreme concept, which ordinarily does not include "[d]iscrimination on the basis of race or religion, as morally reprehensible as it may be."

*Fisher v. INS,* 79 F.3d 955, 961 (9th Cir. 1996) (en banc) (citations omitted). As this definition suggests, we are trying to get at some distinction between mild and severe burdens imposed on those with disfavored religious beliefs.

The record is ambiguous on whether Jehovah's Witnesses were persecuted by the Sandinista government of Nicaragua because of their religion. Evidence of persecution included shutting down the Kingdom Hall, Sandinista Party personnel around the house where Jehovah's Witnesses met telling people the meetings were CIA meetings, and the arrests of male members of the congregation. But there was no evidence that the church would have been allowed to meet together and use the hall but for its religious doctrine, or that the males were arrested because of

their religion as opposed to the universal military conscription. The record could be read to establish that the Sandinistas had a particular animus toward Jehovah's Witnesses. But the record could also allow for the inference that the Sandinistas regarded all religion as a "bourgeois prejudice," "the holy water with which the priest consecrates the heart-burnings of the aristocrat," Karl Marx and Friedrich Engels, *The Communist Manifesto,* 20, 33 (International Publishers 1948), or denied permits and facilities to all groups, religious or not, if they were not instruments of the Sandinista Party. There was no evidence that the permit was denied because of the Jehovah's Witnesses' faith. Also, Ms. Catuse did not feel it necessary to leave until her house was taken, long after the impositions imposed on her church.

The BIA could conclude from substantial evidence on the record as a whole that Ms. Catuse did not have a well-founded fear of persecution because of her religion. She had no record to support fear of persecution because of political opinion or any other statutory ground. Because Ms. Catuse has failed to establish a well-founded fear for asylum purposes, she has necessarily failed to establish that it is "more likely than not" that her life or freedom will be threatened for purposes of § 1253(h). *De Valle v. INS,* 901 F.2d 787, 793 (9th Cir.1990).

### C. *Mrs. Gallegos's Petition.*

 There was not substantial evidence on the record as a whole for the BIA's conclusion that Mrs. Gallegos lacked a well-founded fear of persecution on account of her political opinion. That she had a genuine fear was implicit in the BIA determination that she was telling the truth about fearing that she would be killed. The issue was whether her genuine fear was well founded. The BIA had two grounds for saying it was not: that nothing was done to her while she was in Nicaragua to give a basis for the fear, and that the regime had changed.

Mrs. Gallegos was personally threatened with being "disappeared." The threats were repeated, and were based on her political opinion, which was known to those who threatened her. The threats were backed by the official position of the neighborhood CDS chief and visits from armed soldiers. *See Arteaga v. INS,* 836 F.2d 1227, 1233 (9th Cir.1988)(threat by guerrillas directed at individual whose identity and residence are known may support a well-founded fear).

That she stayed for three years before fleeing cuts against her claim that she feared the threats and that they might be carried out. *See Castillo,* 951 F.2d at 1122 (five year undisturbed residence after single interrogation is substantial evidence that threatening parties lacked will or ability). But the BIA cannot proceed as though there were a rule that if the departure was a considerable time after the first threat, then the fear was not genuine and well founded. Practical, individualized consideration is required. One whose family had lived in a place for generations might not flee at the first sign of danger. Hitler took over as Chancellor of Germany in 1933, after forty years of growing political anti-Semitism, but many Jews did not flee until 1938, and many remained after that, in their homeland of many centuries, hoping for the best. Also, this case does not involve a threat followed by several years of peace. The threats were repeated, and as Mrs. Gallegos's erection of iron bars around her house shows, her perception of the danger was that it was increasing.

There is nothing in the record to support the BIA's doubts that the Sandinistas had the power to carry out these threats. Mrs. Gallegos's family had suffered from considerable political violence. Her brother was arrested for political reasons. Her husband and sister-in-law were beaten and arrested for related reasons. "I have a lot of relatives who are dead, crazy, and without hands." Her Somozista stepfather "did not remain being a judge because a bomb exploded and he ... he was left deaf mute from one ear and torn," although it is not clear from the record who bombed her stepfather. The violence actually committed against other members of Mrs. Gallegos's family, and repetition of threats to her, made her fear of violence well founded. *Hernandez–Ortiz v. INS,* 777 F.2d 509, 515 (9th Cir.1985) (violence against family members supports finding that petitioner's life is in danger); *Prasad,* 47 F.3d at

340 (physical attacks on an applicant's family support a well-founded fear if the pattern of persecution is tied to the petitioner).

At the time of the hearing, a visa was waiting for Mrs. Gallegos at the American Consulate in Nicaragua, yet she was afraid to go back to Nicaragua and get it. It is not clear why the INS continues to oppose her asylum case in the face of this undisputed fact. Her fear of returning to pick up her visa is evidence not only that her fear was genuine, which the INS does not contest, but also that it was well founded. Either she is a fool not to solve her legal problem by a trip home, or she is prudent and sufficiently expert on Nicaraguan conditions to form a sound opinion of the dangers there. It is reasonable to suppose that she is no fool, and has a pretty good sense of whether a trip home to pick up her visa could safely be expected to be a round trip. Her fear of traveling home for the paper which would solve her legal problem is evidence, albeit rebuttable, that the trip would be dangerous. There was no evidence pointing the other way.

Mrs. Gallegos suffered economic persecution in addition to threats of physical violence. Her ration card was taken away, and her business's ability to buy inventory was taken away, on account of her political opinion. *See Kovac v. INS,* 407 F.2d 102, 107 (9th Cir.1969) ("a probability of deliberate imposition of substantial economic disadvantage upon an alien for reasons of . . . political opinion" is sufficient to support a claim of asylum); *cf. Ubau–Marenco v. INS,* 67 F.3d 750, 755 (9th Cir.1995) (no economic persecution where applicant offers no evidence that denial of fabric for factory was the result of political opinion, and there was a widespread fabric shortage). Her family land was taken for political reasons. *See id.* (seizure of family land can contribute to a finding of past persecution).

■ The evidence of past persecution presented by Mrs. Gallegos, including the multiple and continuing death threats, marking her house, taking away of her ration card and means to buy inventory, and harassing and taking away the property of her family, all on account of political opinion,

compel a finding of past persecution. The past persecution was not sufficiently "atrocious" to entitle Mrs. Gallegos to asylum regardless of whether she had a well-founded fear of future persecution. *See Acewicz,* 984 F.2d at 1062 (even when there is little likelihood of future persecution, the BIA may grant asylum where applicant has suffered under atrocious forms of persecution). The past persecution did, however, give rise to a presumption that a fear of future persecution was well-founded. *See Singh v. Ilchert,* 69 F.3d 375, 379 (9th Cir.1995) (a showing of past persecution creates a presumption of a well-founded fear of future persecution rebuttable only by a showing that conditions have changed to such an extent that the inference is invalid). The BIA nevertheless concluded that "there exists from the record before us no likelihood of persecution in the future in view of the change of government in Nicaragua."

■ The BIA determination that the change of government obviated the likelihood of persecution was made without giving Mrs. Gallegos a fair opportunity to present evidence to the contrary. The BIA could mean either of two propositions by its determination: that the threat was eliminated by the time of Mrs. Gallegos's hearing before the IJ or that the threat dissipated over the four years, seven months between her hearing and the BIA decision.

If the BIA viewed the record as of the date of Mrs. Gallegos's hearing, then there was no substantial evidence for its conclusion. The record was replete with evidence that whatever likelihood of persecution had existed before, remained. Petitioners submitted numerous newspaper clippings and other materials, datelined Nicaragua and describing what was happening during the three months between Violeta Chamorro's election and her inauguration. The clippings said that Chamorro was allowing the Sandinistas to retain control of the army and the security forces. The security forces would include the soldiers who told Ms. Gallegos "it was going to be very bad for me should I not join." The CDS, which continually threatened to disappear Ms. Gallegos with a bomb, was presumably still intact. Nicaragua's rejected presi-

dent Daniel Ortega was quoted as saying "the day will come when we return to govern this country from above. Meanwhile we will govern from below." According to the evidence, "almost every Sandinista program, including the military draft, is protected by the constitution. The Sandinistas also control the Supreme Court through appointments that will last until 1993." The record was replete with uncontradicted evidence that the Sandinistas would retain their power to persecute political opponents despite the election. In *Acewicz v. INS,* 984 F.2d 1056 (9th Cir.1993), as in this case, the change of government occurred prior to the hearing, and the petitioner presented evidence that the threat continued despite the change. But in the case at bar, unlike *Acewicz,* there was no evidence to the contrary, and the change of government occurred only two days before the hearing.

The BIA said that Mrs. Gallegos and her daughter had "provided no evidence of any instance in which the Sandinistas, following their removal from power, have harmed or sought to harm them or any other individual in a similar circumstance." If the BIA meant to refer to the time up to Mrs. Gallegos's hearing, this inference from lack of evidence would be specious. Daniel Ortega had been out of the presidency for only two days at the time of the hearing. Two days would not be not enough time for the Sandinistas to harm their political enemies subsequent to the Chamorro inauguration, and for evidence to get back to Mrs. Gallegos and her lawyer to be presented at the hearing. Obviously the Sandinistas could not have harmed Mrs. Gallegos during those two days, because she was in the United States seeking asylum, not in Nicaragua.

From the context, and this remark about what happened after the Sandinistas lost the presidency, it appears that the BIA meant not that the threat to Mrs. Gallegos was gone at the time of the hearing, April 27, 1990, but rather that the threat dissipated during the pendency of her appeal, decided November 18, 1994. It may have. But there is no evidence in the record for that proposition, and taking administrative notice of it deprived Mrs. Gallegos of due process of law.

*Castillo–Villagra v. INS,* 972 F.2d 1017 (9th Cir.1992).

The BIA mentioned *Castillo–Villagra* in a footnote, in words which suggest that it misread the case.

> As the respondents have acknowledged this change of government, we do not find any violation of the respondents' due process rights under the reasoning of *Castillo–Villagra v. INS,* 972 F.2d 1017 (9th Cir.1992), in our response. *See Acewicz v. INS,* 984 F.2d 1056 (9th Cir.1993).

We held in *Castillo–Villagra* that the BIA could take administrative notice of the change of government but could not, without notice and a hearing, take notice that the change eliminated the danger to the petitioner. *Id.* at 1029. The footnote suggests that the BIA had it backwards, concluding that the petitioner was entitled to contest whether there had been a change of government, but when that was conceded, not to contest the effect of the change on the danger to her. Mrs. Gallegos presented evidence that the threat to her would continue indefinitely into the future despite the change of government. *See id.* ("It may be that, were the petitioners given an opportunity to respond to the INS view of the effect of the change in government, they could make no case for a well-found fear. . . . But the agency should not have assumed away petitioners' case.")

If the BIA decided the case on the basis of the evidence as it stood when Mrs. Gallegos's hearing concluded, then there was no due process violation, but also no substantial evidence for the BIA's conclusion, that Mrs. Gallegos lacked a well-founded fear of persecution on account of her political opinion. If the BIA decided the case based on political developments during the four-and-a-half years subsequent to the hearing, then the BIA may have been correct substantively, but Mrs. Gallegos was deprived of her constitutional right to be heard on whether those changes obviated the danger that she would be persecuted. *See Getachew v. INS,* 25 F.3d 841, 847 (9th Cir.1994) (holding that where an INS appellate brief requested that the BIA take notice of a change in government, but did not adequately surmise petitioner of what facts were to be noticed and

**912**

how they were relevant to his case, petitioner did not have an adequate opportunity to respond). If that is what the BIA did, then the case is indistinguishable from *Castillo–Villagra*, where the BIA denied asylum based on political changes after the hearing, without giving petitioner notice and an opportunity to be heard on whether those changes eliminated the danger to her.

■■■■■ The BIA need not limit itself to the state of affairs as of the time the hearing ended. As we held in *Castillo–Villagra*, it may take administrative notice of a subsequent election result and change of government. But if petitioner's case makes it plausible that the threat of political persecution would remain despite that change, then petitioner is entitled to notice that the BIA proposes to treat the threat as dissipated, and an opportunity to be heard on whether that is so. Taking notice of legislative, undebatable facts, such as an election result and new parliamentary majority, does not require notice and an opportunity to be heard, but taking administrative notice of post-hearing debatable adjudicative facts without warning and an opportunity to offer rebuttal denies due process of law. *Castillo–Villagra*, 972 F.2d at 1028–29.

## CONCLUSION

The petition for review by Rosaura Gonzalez Gallegos is GRANTED, and her case is REMANDED for additional proceedings consistent with this opinion. The petition for review by Betty Jeaneth Catuse is DENIED.