January 18, 1994 United States Court of Appeals
United States Court of Appeals
For the First Circuit

No. 92-1678
No. 93-1486

TESFAYE ABERRA GEBREMICHAEL,

Petitioner,

v.

IMMIGRATION AND NATURALIZATION SERVICE,

Respondent.

ON PETITIONS FOR REVIEW OF ORDERS OF THE
BOARD OF IMMIGRATION APPEALS

Before

Torruella, Selya and Stahl,
Circuit Judges.

ERRATA SHEET

The opinion of this Court issued on November 23, 1993, is amended
as follows:

Page 3, line 7: Replace "Jehovah's Witness" with "Seventh
Day Adventist"

Page 3, footnote 3: Replace "Jehovah's Witnesses" with "Seventh
Day Adventists"

December 14, 1993 United States Court of Appeals
United States Court of Appeals
For the First Circuit

No. 92-1678
No. 93-1486

TESFAYE ABERRA GEBREMICHAEL,

Petitioner,

v.

IMMIGRATION AND NATURALIZATION SERVICE,

Respondent.

ON PETITIONS FOR REVIEW OF ORDERS OF THE
BOARD OF IMMIGRATION APPEALS

Before

Torruella, Selya and Stahl,
Circuit Judges.

ERRATA SHEET

The opinion of this Court issued on November 23, 1993, is amended
as follows:

Page 21, continuation of footnote 24, second line - replace
"unless" with "if".

United States Court of Appeals
For the First Circuit

No. 92-1678
No. 93-1486

TESFAYE ABERRA GEBREMICHAEL,

Petitioner,

v.

IMMIGRATION AND NATURALIZATION SERVICE,

Respondent.

ON PETITIONS FOR REVIEW OF ORDERS OF THE
BOARD OF IMMIGRATION APPEALS

Before

Torruella, Selya and Stahl,
Circuit Judges.

Eliza C. Klein for petitioner.

Donald A. Couvillon, Civil Division, Office of Immigration

Litigation, with whom Frank W. Hunger, Assistant Attorney General,

Stuart M. Gerson, Assistant Attorney General, and Richard M. Evans,

Assistant Director, Office of Immigration Litigation, were on brief
for respondent.

November 23, 1993

STAHL, Circuit Judge. In these consolidated

appeals, petitioner Tesfaye Gebremichael claims that the

Board of Immigration Appeals (the Board or BIA) erred in

finding him ineligible for asylum, withholding of

deportation, and suspension of deportation. See 8 U.S.C.

1158(a), 1253(h), and 1254(a) (1988 & Supp. IV 1992).

Petitioner's principal argument is that he is eligible for

asylum as a result of the detention and torture visited upon

him as a means of persecuting his brother. Petitioner also

raises the vexing procedural issue of when the Board can take

"official notice" of country conditions without giving an

alien warning or a predecision opportunity to respond. After

a careful review, we hold that petitioner is statutorily

eligible for asylum and that he is entitled to a meaningful

opportunity to respond to extra-record facts noticed by the

Board.

I.

BACKGROUND1
BACKGROUND

Petitioner is an Ethiopian alien of Amhara descent.

He was born in 1960 in Addis Ababa, where some family members

continue to live. In his early years he lived under the

shadow of the repressive Mengistu regime, although he himself

1. Since neither the underlying facts nor petitioner's
credibility are in dispute, we lay out the facts as described
by petitioner's testimony and other information in the record
submitted by him.

-2-
2

never suffered physical harm or a deprivation of liberty

until he was older.2 Petitioner was allowed to finish his

education. In 1981, he received an engineering degree from

the University of Addis Ababa and was ordered to work at the

Ethiopian Construction Authority.

In September 1982, the military authorities

arrested petitioner's father and younger brother as they were

participating in a Seventh Day Adventist service.3 It is

undisputed that the father and brother were persecuted,

although it is unclear whether they suffered religious

2. Under the feudal regime of Haile Selassie, petitioner's
family was the wealthy owner of several businesses. Shortly
after a revolution in 1974, the Dergue, headed by Mengistu
Haile Mariam, took power and imposed a Marxist regime. The
Dergue carried out a campaign of repression that included the
identification of individuals who had been among the wealthy
class under the former government, repression of religious
and political opposition activity, and extensive surveillance
of civilians by local committees. The Dergue confiscated the
property of petitioner's family. Petitioner, who was
fourteen years old at the time, became active in an
opposition organization, although the Dergue was apparently
not aware of his political activity, if at all, until after
he left the country. In the "Red Terror" of 1976, the Dergue
heightened its repressive activity and killed many suspected
opponents, frequently targeting families -- many of whom were
Amhara -- who had enjoyed a privileged status under Haile
Selassie. Petitioner does not claim that he or his family
fell victim to the Red Terror.

3. While the rest of petitioner's immediate family remained
members of the Ethiopian Orthodox Church, petitioner's father
and younger brother became Seventh Day Adventists just after
the revolution.

-3-
3

persecution, political persecution, or both.4 In any case,

petitioner's father was imprisoned for over two years before

he was released. Petitioner's brother was also imprisoned

but, following his transfer to a hospital in January 1983, he

managed to escape to the family home. Petitioner then helped

"smuggle" his brother out of the country.5

Shortly thereafter petitioner was arrested by the

Dergue. Although the authorities did not have -- and never

obtained -- any information linking petitioner to his

brother's escape, petitioner was accused of aiding the escape

of an enemy of the state. Petitioner was taken to the

Central Investigation Center, controlled by the agency

responsible for investigating anti-revolutionary activities

and opposition to the government. Every day for two weeks

Dergue personnel interrogated and tortured petitioner as they

tried to force him to reveal his brother's hiding place.6

4. According to petitioner, in an attempt to coerce his
father and brother into renouncing their religious beliefs,
the Dergue accused them of "using the name of God and the
church to propagate false information against the state by
working together with foreign Interventionists (i.e., the
CIA) who sought to overthrow the government." To the extent
that the Dergue imputed pro-Western political beliefs to the
father and brother, they may have suffered political
persecution.

5. The brother has since been granted political asylum in
the United States.

6. Petitioner described his experience as follows:

Each day, I would be taken from my cell
to a room where the interrogations took

-4-
4

Petitioner was then held for an additional three and a half

months in a different section of the Center. He was no

longer interrogated but was occasionally forced to crawl on

sharp stones. In late June 1983, petitioner was released

after the Dergue learned that his brother had left the

country. Upon release he was threatened with execution if he

were to engage in any political or religious activities

disfavored by the government. There is little evidence in

place. There, two men with masks over
their heads would beat me on the soles of
my feet [and] then they would call in the
political cadre, who demanded information
about my brother. I always said that I
knew nothing about his whereabouts or
this escape. The political cadre would
then order the other men to inflict
various tortures on me before I would be
subjected to the next round of questions.
Sometimes they would push my head into a
tank of filthy water until I nearly lost
consciousness. Then they would let me up
and I would be questioned again. At
other times they would threaten to kill
me and then enact a mock execution. In
still another method used to make me
talk, they would throw me onto the floor
of a dark cell and kick me all over my
body, including my head and genitals. On
other occasions I would just be beaten,
and frequently I was made to crawl on my
knees over sharp stones for a half hour
at a time. In all, the interrogation
sessions usually lasted approximately
three hours, at the end of which I could
be physically thrown or kicked back into
my cell.

-5-
5

the record that petitioner was ever formally charged,

prosecuted, or convicted.7

Fearing additional mistreatment if the Dergue

learned of his role in his brother's escape or his own

opposition political activities, petitioner made plans to

leave the country. He obtained an illegal passport and,

through UNESCO, secured a student visa and scholarship to

attend graduate school in Sierra Leone. He left Ethiopia in

October 1983.

After completing his studies in June 1985,

petitioner still feared persecution should he return to

Ethiopia but believed he would not be allowed to remain in

Sierra Leone. While it is not clear when petitioner decided

to attempt to stay in the United States, he entered this

country on June 23, 1985, with a six month visitor's visa.8

Petitioner applied for asylum on December 12, 1985.

At a deportation hearing later that month,

petitioner conceded deportability but moved for three forms

of relief from deportation under the Immigration and

7. We note again that the immigration judge did not
discredit petitioner's testimony, which was corroborated to
an extent by a physical examination of petitioner (which
showed permanent scars on his knees) as well as evidence from
the State Department and human rights organizations
describing the Dergue's typical torture techniques.

8. Petitioner's brother was living in the United States at
the time.

-6-
6

Nationality Act (INA): political asylum,9 withholding of

deportation10 and voluntary departure.11 8 U.S.C.

1158(a), 1253(h), and 1254(e) (1988 & Supp. IV 1992). The IJ

granted petitioner's request for voluntary departure but

denied the other two applications. Petitioner then appealed

to the Board, which received briefs in November 1989 and

heard oral argument in March 1990. The Board did not issue a

decision until two years had passed.

9. Under 8 U.S.C. 1158(a) the Attorney General (whose
authority in these matters is delegated to the INS, with
review by the Board) has the discretion to grant asylum to an
alien who qualifies as a "refugee" within the meaning of 8
U.S.C. 1101(a)(42)(A) (1988). In relevant part, section
1101(a)(42)(A) defines "refugee" as

any person who is outside any country of
such person's nationality . . . and who
is unable or unwilling to return to, and
is unable or unwilling to avail himself
or herself of the protection of, that
country because of persecution or a well-
founded fear of persecution on account of
race, religion, nationality, membership
in a particular social group, or
political opinion.

10. 8 U.S.C. 1253(h)(1) provides that "[t]he Attorney
General shall not deport or return any alien . . . to a
country if the Attorney General determines that such alien's
life or freedom would be threatened in such country on
account of race, religion, nationality, membership in a
particular social group, or political opinion.

11. 8 U.S.C. 1254(e)(1) gives the Attorney General
discretion to "permit any alien under deportation proceedings
. . . to depart voluntarily from the United States at his own
expense in lieu of deportation if such alien shall establish
to the satisfaction of the Attorney General that he is, and
has been, a person of good moral character for at least five
years immediately preceding his application for voluntary
departure."

-7-
7

In the intervening time, conditions in Ethiopia had

changed drastically. Mengistu fled the country in May 1991,

the Dergue was quickly dismantled, and a multiparty

transitional government was established to organize

democratic elections. The transitional government declared

that citizens in exile were welcome to return.

In its decision on March 25, 1992, the Board not

only reviewed the record de novo but also looked beyond the

record to take administrative notice of the political changes

in Ethiopia as described in a state department report. The

Board did not inform petitioner of its intention to notice

these facts, nor did it give petitioner an opportunity to

respond. Although it extended the time for voluntary

departure, the Board affirmed the IJ's finding that

petitioner was not eligible for either asylum or withholding

of deportation.

The Board found petitioner ineligible for asylum

for failure to prove either past persecution or a well-

founded fear of future persecution. The Board reasoned that

petitioner had not shown that the "reprehensible" detention

and torture inflicted on him in 1983 were "to punish him for

one of the five grounds specified in the [INA] rather than to

compel him to reveal the whereabouts of his missing brother."

In re Gebremichael, No. A26876916, slip op. at 3 (BIA Mar.

25, 1992) (Gebremichael I). The Board also found that

-8-
8

petitioner had not demonstrated a well-founded fear of future

persecution on any basis. Additionally, the Board noted that

the political changes in Ethiopia undercut petitioner's

claims that he might be persecuted if he were repatriated.

Finally, the Board rejected the request for withholding of

deportation, which requires an even greater showing of the

likelihood of future persecution.

Petitioner then filed with the Board a motion to

reconsider its denial of asylum and withholding of

deportation as well as to reopen to allow him to apply for

-9-
9

suspension of deportation.12 Concurrently, petitioner

sought review in this court.13

12. Pursuant to 8 U.S.C. 1254(a) (1988 & Supp. IV 1992):

the Attorney General may, in his
discretion, suspend deportation [of an
alien who] has been physically present in
the United States for a continuous period
of not less than seven years immediately
preceding the date of [the suspension
application,] and proves that during all
of such period he was and is a person of
good moral character; and is a person
whose deportation would, in the opinion
of the Attorney General, result in
extreme hardship to the alien.

Under 8 C.F.R. 3.2 (1993), the Board "may on its own
motion reopen or reconsider any case in which it has rendered
a decision." The regulation provides, however, that
"[m]otions to reopen in deportation proceedings shall not be
granted unless it appears to the Board that evidence sought
to be offered is material and was not available and could not
have been discovered or presented at the former hearing."
Id.

13. The Board's first decision was a "final order[] of
deportation" that can be appealed to this court pursuant to 8
U.S.C. 1105a (1988 & Supp. IV 1992). While a petitioner
must "exhaust[] the administrative remedies available to him
as of right under the immigration laws and regulations," 8
U.S.C. 1105a(c), a petitioner need not move for rehearing
by the Board in order to fulfill the exhaustion requirement.
Rhoa-Zamora v. INS, 971 F.2d 26, 31 (7th Cir. 1992), cert.

denied 113 S. Ct. 2331 (1993). But see Dokic v. INS, 899

F.2d 530, 532 (6th Cir. 1990). We have not yet decided, as
have some circuits, whether the filing of a motion to reopen

deprives us of jurisdiction we would otherwise have. See

White v. INS, No. 92-2949, 1993 WL 393862, at *6 (8th Cir.

Oct. 8, 1993) (holding that pendency of motion to reopen or
reconsider an order of deportation does not render the order
nonfinal for jurisdictional purposes); Rhoa-Zamora, 971 F.2d

at 32-33 (same); Alleyne v. INS, 879 F.2d 1177, 1181 (3d Cir.

1989) (same). But see Fleary v. INS, 950 F.2d 711, 713 (11th

Cir. 1992) (filing of motion to reopen render's BIA decision
nonfinal and non-appealable); Jian Gang Chu v. INS, 875 F.2d

777, 780-81 (9th Cir. 1989) (same). In this case, we opted

-10-
10

In support of his motion to reconsider, petitioner

offered an array of new evidence to bolster his proof of a

well-founded fear of future persecution. Relying on

affidavits and background material, petitioner claimed that

persecution was once again part of the currency of political

conflict in Ethiopia. There was evidence that the multiparty

coalition that ousted Mengistu had fractured and that the

government was dominated by Marxist members of the Tigray

ethnic group who were increasingly intolerant of political

and ethnic differences. There was also evidence that, should

he return to Ethiopia, petitioner could face persecution

based on his Amhara ethnicity,14 his family's privileged

social status before the 1974 revolution, and his expatriate

political activity in opposition to the new government.

As part of his motion for rehearing, petitioner

also moved to reopen so that he could apply for suspension of

deportation on the ground that repatriation would constitute

"extreme hardship" to him. While petitioner did not claim

that he would be unable to make a living in Ethiopia, he

for a prudent alternative: staying our decision until the
Board resolved petitioner's motions and consolidating the
initial appeal with an appeal from a denial of the motion for
rehearing.

14. We note in passing that one federal court recently found
that "the Amharan people are now the subject of persecution
by the Tigrean government that is in power in Addis Ababa,"
and that an Ethiopian alien of Amhara descent had raised a
"well-founded fear of persecution." United States v.

Dagnachew, 808 F. Supp. 1517, 1522 (D. Colo. 1992).

-11-
11

argued that his departure would rupture important family

ties,15 deprive him of "the only safe home [he] has known

since he was fourteen years old," and aggravate his

depression and anxiety, perhaps to the point of suicide.

Reaching the merits of petitioner's claims, the

Board stated that "none of the evidence presented by this

respondent in any way changes our view of the respondent's

asylum application." In re Gebremichael, No. A26876916, slip

op. at 3 (BIA Apr. 20, 1993) (Gebremichael II). Once again,

without warning and without providing a predecision

opportunity to respond, the Board took administrative notice

of another state department report which suggested that there

had been no widespread acts of persecution of minorities,

including the Amharas. The Board then reaffirmed its finding

that petitioner was ineligible for asylum or withholding of

deportation.

Finally, the Board found that petitioner failed to

present prima facie evidence of "extreme hardship" sufficient

15. Five of petitioner's siblings are currently in the
United States: Solomon was admitted in 1984 as a refugee;
Getachew was admitted as a refugee in 1991 (after Mengistu's
fall); Tiruwork is a permanent resident; and Genet and Yosef
are students in the United States. Getachew and Yosef live
with petitioner, although there is no evidence that they are
currently dependent on him. While petitioner's mother is
also a permanent resident, she has since returned to Addis
Ababa to be with petitioner's father and sister Tigist. One
brother has already filed a visa petition to allow the father
to come to the United States.

-12-
12

to qualify him for suspension of deportation.16 To support

its finding, the Board noted that petitioner (1) did not

appear to be the primary financial support of any family

member; (2) is a highly educated young man who could probably

obtain employment anywhere he went; (3) has sizable bank

assets which he could use to reestablish himself in Ethiopia;

(4) did not present entirely credible evidence of the

psychological consequences of repatriation; and (5) did not

substantiate his claim that he would be targeted by the

present government in Ethiopia.

Petitioner appealed the denial of the motion to

reopen and reconsider and we consolidated the two appeals.

II.

STANDARD OF REVIEW

The Board's determination of statutory eligibility

for relief from deportation -- a mixed question of law and

fact -- is conclusive if "supported by reasonable,

substantial, and probative evidence on the record considered

as a whole." 8 U.S.C. 1105a(a)(4) (1988); INS v. Elias-

16. The INS did not dispute petitioner's allegations that,
during the course of nearly eight years of immigration
proceedings, petitioner has been physically present in the
United States and has been a person of good moral character.
Petitioner has never been arrested in the United States and
his imprisonment and torture at the hands of the Dergue was
his only brush with the law in Ethiopia. Petitioner has been
employed since September 1985.

-13-
13

Zacarias, 112 S. Ct. 812, 815 (1992).17 Thus, to obtain

reversal of the Board's determination of ineligibility,

petitioner "must show that the evidence he presented was so

compelling that no reasonable factfinder could fail to find

[the elements of statutory eligibility]." Elias-Zacarias,

112 S. Ct. at 817.

III.

DISCUSSION

Of the multitude of issues petitioner raises, two

arguments require serious consideration: (1) the Board erred

in failing to find petitioner eligible for asylum based on

his detention and torture at the hands of the former

Ethiopian government; and (2) the Board unfairly surprised

petitioner by taking administrative notice of conditions in

his country of origin. We address each in turn.18

17. We agree with respondent that we normally review a
denial of a motion to reopen or reconsider for abuse of
discretion. See INS v. Doherty, 112 S. Ct. 719, 724-25

(1992); Leblanc v. INS, 715 F.2d 685, 692-93 (1st Cir. 1983).

We do not agree, however, that the abuse of discretion
standard governs the assignment of error at issue in this
case. Where the agency denies a motion to reopen or
reconsider by making a determination of statutory
eligibility, that determination must be supported by
substantial evidence. See Elias-Zacarias, 112 S. Ct. at 815

(reviewing asylum eligibility determination for substantial
evidence even after Board's discretionary denial of motion to
reopen).

18. We do not address in any detail petitioner's meritless
argument that the Board erred in finding him ineligible for
withholding of deportation under 8 U.S.C. 1253(h). Even
without recourse to extra-record evidence of country
conditions, the Board reasonably found that petitioner had

-14-
14

A. Asylum

Asylum involves a two-step process: (1) a finding

of statutory eligibility; and (2) a discretionary decision

whether to grant asylum. Alvarez-Flores, 909 F.2d at 3. An

alien is eligible for asylum if he can show that, on account

of one of the five grounds enumerated in the INA, supra note

9, he has suffered past persecution or has a well-founded

fear of future persecution. See Ravindran v. INS, 976 F.2d

754, 758 (1st Cir. 1992) (citing Desir v. Ilchert, 840 F.2d

723, 729 (9th Cir. 1988) ("[P]ast persecution, without more,

satisfies the [definition of refugee] even independent of

establishing a well-founded fear of future persecution."));

see also Skalak v. INS, 944 F.2d 364, 365 (7th Cir. 1991); In

re H-M, Int. Dec. 3204, 1993 WL 315990, at *4 (BIA Aug. 11,

1993); In re T-, Int. Dec. 3187, slip op. at 9 (BIA Oct. 13,

1992); In re Chen, Int. Dec. 3104, slip op. at 3-4 (BIA Apr.

25, 1989); 8 C.F.R. 208.13(b) (1993) ("The applicant may

not demonstrated a "clear probability" of future persecution
should he return to Ethiopia. See Alvarez-Flores v. INS, 909

F.2d 1, 3 (1st Cir. 1990) (citing INS v. Stevic, 467 U.S.

407, 429-30 (1984)). For the reasons stated infra note 19,

we express no opinion on whether the Board erred in finding
that petitioner failed to make the lesser showing of a "well-
founded" fear of future persecution with respect to the
asylum claim. Cf. Alvarez-Flores, 909 F.2d at 4 (discussing

difference between standards for asylum and withholding of
deportation); Blanco-Comarribas v. INS, 830 F.2d 1039, 1042

(9th Cir. 1987) (holding that fear is "well-founded" if there
is "[e]ven a ten percent chance that the occurrence will take
place") (citing INS v. Cardoza-Fonseca, 480 U.S. 421, 431

(1987)).

-15-
15

qualify as a refugee either because he has suffered actual

past persecution or because he has a well-founded fear of

future persecution.") (emphasis supplied).

Petitioner claims that the Board erred in finding

him ineligible for asylum despite the torture and lengthy

detention he suffered under Ethiopia's former regime. The

Board did not find that the harm inflicted upon petitioner

was too mild to constitute persecution. Instead, the Board

essentially held that petitioner was merely a vehicle for the

persecution of his brother and not the victim of

"persecution" within the meaning of the INA. The Board

reasonably found that the Dergue did not detain and torture

petitioner because of his own actual or imputed political or

religious beliefs. Nonetheless, however reasonable this

finding, it does not dispose of petitioner's asylum claim.

Petitioner argues -- and we agree -- that he was persecuted

for other reasons equally cognizable under the INA.

Petitioner's strongest argument is that he is a

refugee because he was mistreated on account of his

relationship to his brother.19 While most asylum claims

19. Petitioner also advances two other theories to support
his claim of past persecution: (1) he is a political or
religious refugee because he was an intended conduit for the
political or religious persecution of another; and (2) he is
a political refugee because he suffered excessive punishment
under suspicious circumstances. In addition, petitioner
claims that he is eligible for asylum based on a well-founded
fear that he will face future persecution in Ethiopia on
account of his ethnicity, social status and political views.

-16-
16

involve other types of persecution, the INA also offers

refugee status to victims of "persecution on account of . . .

membership in a particular social group." 8 U.S.C.

1101(a)(42)(A).20 An applicant qualifies as a "refugee"

under the INA if membership in a social group is "at the root

of persecution," such that membership itself generates a

"specific threat to the [applicant]." Ananeh-Firempong, 766

F.2d at 626-27 (citation and quotation omitted).

Accordingly, we must determine whether a family is a

cognizable "social group" within the meaning of the INA and,

if so, whether petitioner's torture and detention by the

authorities can be traced to his family membership.

In laying out general principles governing this

type of persecution, the Board has stated that

In light of our holding below that petitioner is a social
refugee based on past persecution, we do not address these
other theories.

20. This ground of persecution is not frequently used or
interpreted, probably because most asylum claims involve
other types of persecution as well. See United Nations High

Commissioner for Refugees, Handbook on Procedures and

Criteria for Determining Refugee Status 77, at 19 (1979)

(U.N. Handbook) ("A claim to fear of persecution [based on
membership in a particular social group] may frequently
overlap with a claim to fear of persecution on other grounds,
i.e. race, religion or nationality."); cf. Ananeh-Firempong

v. INS, 766 F.2d 621, 626 (1st Cir. 1985) (referring to U.N.

Handbook as a "useful tool" for interpreting the phrase
"social group") (citation omitted). At the same time, we
have followed the language of the statute in recognizing that
social group persecution can be an independent basis of
refugee status. See Ananeh-Firempong, 766 F.2d at 626-627.

-17-
17

"persecution on account of membership in
a particular social group" encompasses
persecution that is directed toward an
individual who is a member of a group of
persons all of whom share a common,
immutable characteristic. The shared
characteristic might be an innate one
such as sex, color, or kinship ties, or

in some circumstances it might be a
shared past experience such as former
military leadership or land ownership.
The particular kind of group
characteristic that will qualify under
this construction remains to be
determined on a case-by-case basis.
However, whatever the common
characteristic that defines the group, it
must be one that the members of the group
either cannot change, or should not be
required to change because it is
fundamental to their individual
identities or consciences.

In re Acosta, 19 I. & N. Dec. 211, 233 (BIA 1985) (emphasis

supplied), overruled on other grounds by In re Mogharrabi, 19

I. & N. Dec. 439 (BIA 1987). See also Gomez v. INS, 947 F.2d

660, 664 (2d Cir. 1991) (explaining that a social group must

be "recognizable and discrete" such that the "would-be

persecutors could identify them as members of the purported

group").

There can, in fact, be no plainer example of a

social group based on common, identifiable and immutable

characteristics than that of the nuclear family. Indeed,

quoting the Ninth Circuit, we recently stated that "`a

prototypical example of a `particular social group' would

consist of the immediate members of a certain family, the

family being a focus of fundamental affiliational concerns

-18-
18

and common interests for most people.'" Ravindran, 976 F.2d

at 761 n.5 (1st Cir. 1992) (quoting Sanchez-Trujillo v. INS,

801 F.2d 1571, 1576 (9th Cir. 1986)).21

We now turn to the question of causation. In the

case on appeal, the link between family membership and

persecution is manifest: as the record makes clear and the

INS itself concedes, the Ethiopian security forces applied to

petitioner the "time-honored theory of cherchez la famille

(`look for the family')," the terrorization of one family

member to extract information about the location of another

family member or to force the missing family member to come

forward. As a result, we are compelled to conclude that no

reasonable factfinder could fail to find that petitioner was

singled out for mistreatment because of his relationship to

his brother. Thus, this is a clear case of "[past]

persecution on account of . . . membership in a particular

social group." 8 U.S.C. 1101(a)(42)(A). Accordingly, we

must determine what relief, if any, is necessary.

Remand will not always be appropriate when the

Board has erred in determining eligibility for discretionary

relief from deportation. If the Board has already properly

21. The exact state of the law in the Ninth Circuit is not
entirely clear. Without mentioning Sanchez-Trujillo or

analyzing the question in depth, a panel in Estrada-Posadas

v. INS, 924 F.2d 916, 919 (9th Cir. 1991), held that the

concept of persecution of a social group does not extend to
the persecution of a family.

-19-
19

exercised its discretion to deny relief, remand would be a

futile gesture. See Leblanc, 715 F.2d at 691 (finding no

need to remand where Board "clearly made a discretionary

decision"); see also Dhine v. Slattery, 3 F.3d 613, 619 (2d

Cir. 1993) (declining to remand to IJ on issue of relief from

deportation where BIA had "plainly stated" that it would not

grant relief in the exercise of discretion even if applicant

were eligible). In this case, however, the Board has not

clearly stated that it would deny asylum if petitioner were

eligible. Quite the contrary, the Board has asserted that

"[b]ecause we have found that the respondent failed to

establish his statutory eligibility for asylum, we need not

address whether he merits that form of relief in the exercise

of discretion." Gebremichael I, slip op. at 3.22

22. Even absent an obvious exercise of discretion, we might
decline to remand if reconsideration by the agency would
clearly be an empty exercise. See Hibbert v. INS, 554 F.2d

17, 21 (2d Cir. 1977) (holding that, since relief obviously
would be denied as a matter of discretion, "there is no
reason to remand the case to the Board for a pointless
determination" of statutory eligibility); see also In re San

Juan Dupont Plaza Hotel Fire Litigation, 994 F.2d 956, 968-69

(1st Cir. 1993) (noting that appellate court may forego
remand where remanding would be an empty exercise). Here,
the Board did state that there were no "humanitarian or
compelling bases warranting a grant of asylum," Gebremichael

I, slip op. at 3. Nonetheless, compelling circumstances

appears to be an alternative basis for granting asylum, not

an independently sufficient ground for denying asylum. See

In re Chen, Int. Dec. 3104, slip op. at 5; 8 C.F.R.

208.13(b)(1) (1993). Moreover, Board precedent and agency
regulations indicate that the Board will choose to deny
asylum if it finds that the agency has proven that it is more
likely than not that petitioner lacks a well-founded fear of
persecution. See In re Chen, slip op. at 4; 8 C.F.R.

-20-
20

Accordingly, we vacate the Board's conclusion that petitioner

is ineligible for asylum and remand for a decision whether

the Board, in its discretion, will grant asylum in this

case.23

B. Official Notice

Petitioner's second major argument is that the

Board's taking of official notice of extra-record material

fell short of fundamental standards of procedural fairness.

Since the noticed material is likely to play an important

208.13(b)(1). In this case, a careful reading of the record
suggests that there is conflicting evidence about the
likelihood of future persecution. As will be discussed
below, our crystal ball may also be clouded by procedural
error. Petitioner was not afforded an opportunity to respond
to the noticed fact that Amharas have not suffered
persecution under the new regime, a fact which has clearly
played an important role in the case. As a result, we cannot
conclude that remand would be a futile gesture.

23. We note that the Board appears to have misstated the
agency's own guidelines for exercising discretion in an
asylum case. The Board stated:

Even if one were to assume, however, that
[petitioner's] previous experiences in
Ethiopia did amount to past persecution,
or that at the time he left and for some
time thereafter he had a well-founded
fear of persecution should he return, it
has not be established that he presently
merits a grant of asylum.

Gebremichael I, slip op. at 3. The proper rule is that once

an applicant has shown past persecution, the burden shifts to
the government to show that the applicant lacks a well-
founded fear of future persecution. See In re Chen, Int.

Dec. 3104, slip op. at 4; 8 C.F.R. 208.13(b).

-21-
21

role on remand,24 we address this issue as well. We first

discuss when and how the Board may take official notice of

extra-record facts. We then determine whether it was proper

for the Board to take notice of both indisputable and

disputable facts concerning Ethiopia without giving

petitioner any warning or a predecision opportunity to

respond.

1. The Legal Framework

In keeping with standard principles of

administrative procedure and in the absence of any

prohibition in the INA itself, the Board has the discretion

to take "official" or "administrative" notice of extra-record

legislative facts. See, e.g., Kaczmarczyk v. INS, 933 F.2d

588, 593 (7th Cir.), cert. denied, 112 S. Ct. 583 (1991); see

generally 3 Kenneth C. Davis & John P. Wilson, Administrative

Law Treatise 15, at 132-217 (2d ed. 1980).25 Thus, the

24. Board precedent and agency regulations indicate that the
exercise of discretion on remand will depend heavily on
extra-record evidence of country conditions. See In re Chen,

Int. Dec. 3104, slip op. at 4 (Board may take administrative
notice of changed circumstances in determining whether to
grant asylum); 8 C.F.R. 208.13(b)(1) (victim of past
persecution shall be denied asylum if it is more likely than
not that, due to current country conditions, applicant lacks
well-founded fear of future persecution).

25. Legislative facts are those which "do not usually
concern the immediate parties but are the general facts which
help the tribunal decide questions of law and policy and
discretion." 2 Administrative Law Treatise, supra, 12:3,

at 413. In contrast, "adjudicative facts usually answer the
questions of who did what, where, when, how, why, with what
motive or intent." Id.

-22-
22

Board is free to take official notice of facts such as a

change in government in an applicant's home country. See

Acewicz v. INS, 984 F.2d 1056, 1060 (9th Cir. 1993)

(reviewing cases); Gutierrez-Rogue v. INS, 954 F.2d 769, 773

(D.C. Cir. 1992); Rivera-Cruz v. INS, 948 F.2d 962, 966-67

(5th Cir. 1991); Kapcia v. INS, 944 F.2d 702, 705 (10th Cir.

1991); Kaczmarczyk, 933 F.2d at 593-94; McLeod v. INS, 802

F.2d 89, 93 n.4 (3d Cir. 1986); Zamora v. INS, 534 F.2d 1055,

1062 (2d Cir. 1976) (Friendly, J.).26

26. Some courts have suggested that the propriety of
official notice turns on whether the extra-record fact is
beyond reasonable dispute. See Kapcia, 944 F.2d at 705

("commonly acknowledged facts" subject to official notice);
Kaczmarczyk, 933 F.2d at 593-94 (same); McLeod v. INS, 802

F.2d at 93 n.4 (same); Dhine v. District Director, 818 F.

Supp. 671, 677 (S.D.N.Y.) (BIA erred in taking administrative
notice of reasonably disputable fact that there had been no
persecution of Jews in Ethiopia after fall of Mengistu
regime), rev'd in part on other grounds, 3 F.3d 613 (2d Cir.

1993).

If there is a rule against notice of disputable facts,
however, it is not applied strictly. Courts have held that
the Board may draw reasonable inferences from indisputable
facts, even though the inferences bear a striking resemblance
to disputable facts. See Kapcia, 944 F.2d at 705 (after

taking administrative notice of Solidarity's commonly
acknowledged position in Poland's new coalition government,
BIA reasonably inferred that Solidarity members will not be
persecuted); Kaczmarczyk, 933 F.2d at 594 (same). Courts

have also treated as indisputable certain facts that arguably
are not. Compare Gutierrez-Rogue v. INS, 954 F.2d at 773

(holding that Board could take official notice of fact that
Sandinista party no longer governs Nicaragua) with Castillo-

Villagra v. INS, 972 F.2d 1017, 1027 (9th Cir. 1992) (holding

that fact that Sandinistas were ousted from power in
Nicaragua was debatable because Sandinistas retained power
over police and military).

-23-
23

In contrast to the opaque question of the proper

subject of official notice, the more important question

concerns the proper procedure for reliance on extra-record

facts when an alien's freedom to stay in this country hangs

in the balance. Since the exclusive administrative

procedures of the INA do not include rules governing official

notice, petitioner's procedural claim must rest on the Due

Process Clause of the Fifth Amendment.27 See Kaczmarczyk,

933 F.2d at 595. It is well settled that an alien in a

deportation proceeding is entitled to procedural due process.

Id. at 595-60 (collecting cases). The issue is what process

We find the distinction between disputable and
indisputable legislative facts to be an unnecessary
distraction from the procedural rights at issue. Professor
Davis suggests -- and we agree -- that any useful legislative
fact is properly subject to official notice whether that fact
is disputable or not. 3 Administrative Law Treatise, supra,

15.11, at 185-87.

27. Agency regulations promulgated in 1990 already provide
procedural protection governing the taking of official notice
by asylum officers. See 55 Fed. Reg. 30,674 (1990) (now

codified at 8 C.F.R. 208.12(a) (1993)) ("Prior to the
issuance of an adverse decision made in reliance upon [state
department materials], that material must be identified and
the applicant must be provided with an opportunity to
inspect, explain, and rebut the material . . . .") On its
face, however, the regulation applies to asylum officers, not
immigration judges or the Board of Immigration Appeals. In
its 1992 decision on the merits, the Board took official
notice of conditions in Ethiopia without referring to section
208.12(a). Gebremichael I, slip op. at 2. Similarly, in its

decision on the motion to reconsider, the Board claimed that
its notice-taking authority derived from its "discretionary
powers of review" under 8 C.F.R. 3.1(d)(1) (1993), which
sets forth the general powers of the Board. Gebremichael II,

slip op. at 3.

-24-
24

is due when the Board chooses to take official notice of

conditions in the applicant's home country.

We agree with the majority of those circuits which

have addressed the question that the motion to reopen process

can ordinarily satisfy the demands of due process.28 See

Gutierrez-Rogue, 954 F.2d at 773 (motion to reopen procedure

provides adequate opportunity to challenge officially noticed

fact); Rivera-Cruz, 948 F.2d at 968 (same); Kaczmarczyk, 933

F.2d at 595-97 (presuming that good faith administration of

motion to reopen process is sufficient to satisfy that

right). But see Castillo-Villagra, 972 F.2d at 1029 (holding

that motion to reopen process is not adequate to satisfy due

process); Administrative Law Treatise, supra, 12:4, at 320

(Supp. 1989) ("The sound practice for both courts and

agencies would be one of full liberality in allowing the free

28. The distinction between disputable and undisputable
facts has also unnecessarily confused the question of what
procedure should govern official notice in immigration
proceedings. For example, the Seventh Circuit has suggested
that only "uncontroverted facts" are noticeable and then only
when the applicant has an adequate opportunity to respond.
Kaczmarczyk, 933 F.2d at 594-96. In contrast, the Ninth

Circuit has suggested that the Board may take notice of both
indisputable and disputable facts, see Castillo-Villagra, 972

F.2d at 1028, but that the Board need not provide any
opportunity to rebut indisputable facts, see Acewicz, 984

F.2d at 1060. The distinction should not be dispositive
because an applicant is ordinarily entitled "not only to
refute but, what in this situation is usually more important,
to supplement, explain, and give different perspective to the
facts upon which the agency relies." Kaczmarczyk, 933 F.2d

at 596 n.7 (quoting 4 Jacob A. Stein et al., Administrative

Law, 25.01 n.7 (1986)) (internal citation omitted).

-25-
25

use of legislative facts . . . along with strictness in

requiring that parties be given a predecision chance to

respond to whatever extra-record facts are relied upon.")

(emphasis supplied).29

When, however, the Board intends to take official

notice in deciding a motion to reopen or reconsider it would

be absurd to force an applicant to file a second motion to

respond to the newly noticed facts. A multiplicity of

motions for rehearing in this context would have two

undesirable effects: dilution of the applicant's procedural

rights and concentration of the incentive to prolong

litigation. Cf. INS v. Rios-Pineda, 471 U.S. 444, 450 (1985)

(discussing alien's incentive to delay deportation through

meritless appeals). Thus, even if the availability of a

motion to reopen or reconsider will ordinarily suffice, the

demands of due process will, as always, ultimately depend on

29. The motion to reopen process was clearly not designed as
an opportunity to respond to officially noticed facts. See

generally Gomez-Vigil v. INS, 990 F.2d 1111, 1125 (9th Cir.

1993) (per curiam) (Fletcher, J., concurring) ("Section 3.2
proceedings do not suffice because they serve a different
purpose and are intended to provide relief for a different
problem.") An applicant may be constitutionally entitled to
marshall old facts in new ways, although a motion to reopen
cannot be granted unless the evidence offered was previously
unavailable. See 8 C.F.R. 3.2. Further, the filing of a

motion to reopen does not automatically stay deportation.
See Castillo-Villagra, 972 F.2d at 1029; Kaczmarczyk, 933

F.2d at 597 n.9. Vindication of an applicant's procedural
rights thus depends on the good faith of the Board in
handling the motion to reopen. Accord Kaczmarczyk, 933 F.2d

at 597 n.9.

-26-
26

the circumstances. See Mathews v. Eldridge, 424 U.S. 319,

324 (1976). We therefore turn to an analysis of the

particular circumstances animating petitioner's case.

2. Petitioner's Opportunity to Respond

As it was free to do, the Board took administrative

notice of legislative facts contained in two state department

reports as evidence that petitioner lacks a well-founded fear

of persecution. See Country Reports on Human Rights

Practices for 1992 (February 1993); Country Reports on Human

Rights Practices for 1991 (February 1992). The Board cited

the reports for the following propositions: (1) in late May

1991, President Mengistu Haile-Mariam fled into exile; (2) in

July 1991, a broad-based national conference adopted a

charter establishing a multiparty transitional government to

organize elections before 1994; (3) the transitional

government declared that all citizens in exile were welcome

to return; (4) the change of government brought significant

improvement in human rights, particularly with respect to

freedom of speech, assembly, association, religion, and

travel; and (5) after the 1991 change of government, there

were no widespread acts of persecution of minorities,

including the Amharas. Gebremichael I, slip op. at 2;

Gebremichael II, slip op. at 4.

Based on the principles outlined above, all of the

extra-record facts considered by the Board were the proper

-27-
27

subject of official notice. This is true for the first three

"commonly acknowledged facts" concerning the change of

government and statements in public documents. It is equally

true for the last two propositions, even though they are

reasonably disputable generalizations about actual conditions

in Ethiopia.

The more important question is whether petitioner

was afforded an adequate opportunity to respond to the

noticed facts. The Board did not warn petitioner of its

intention to use extra-record materials; in neither instance

did petitioner have a predecision opportunity to respond.

Cf. Acewicz, 984 F.2d at 1061 (finding no procedural error

where applicants did in fact offer evidence before IJ and BIA

in response to noticed change of government). Arguably, the

motion to reopen process allowed the Board to cure the first

procedural irregularity because petitioner had ample

opportunity to respond to the material originally noticed.

However, petitioner never had an opportunity to respond to

the material noticed in the Board's decision on the motion to

reopen and reconsider -- the (disputable) fact that there had

been no widespread persecution of Amharas after the 1991

change of government. In depriving petitioner of an

opportunity to respond to this newly noticed fact prior to

its adverse decision on the motion to reopen and reconsider,

-28-
28

the Board abused our presumption of good faith and ran afoul

of petitioner's procedural rights.30

C. Suspension of Deportation

In addition to requesting a rehearing on his asylum

request, petitioner also moved to reopen his deportation

proceedings in order to apply for suspension of deportation

under 8 U.S.C. 1254(a)(1). Since the Board has already

denied the motion to reopen on the merits and since

suspension will be petitioner's only remaining remedy if the

Board exercises its discretion to deny asylum, we briefly

address this issue as well.

Like an asylum application, suspension involves a

two-step process: (1) a finding of statutory eligibility; and

(2) an exercise of agency discretion. See Vasquez v. INS,

767 F.2d 598, 601 (9th Cir. 1985). An alien is eligible for

suspension of deportation if he

has been physically present in the United
States for a continuous period of not
less than seven years immediately
preceding the date of [the suspension
application;] is a person of good moral
character; and is a person whose
deportation would, in the opinion of the
Attorney General, result in extreme

30. We take no position on the exact nature of the process
that was due, such as whether petitioner was entitled to an
evidentiary hearing or merely an opportunity to respond to
the noticed facts with an additional brief supplemented by
affidavits or other documentary evidence. Nor do we decide
in this case whether an applicant is always entitled to
respond when the Board takes notice of indisputable extra-

record facts.

-29-
29

hardship to the alien or to his spouse,

parent, or child, who is a citizen of the
United States or an alien lawfully
admitted for permanent residence.

8 U.S.C. 1254(a)(1) (emphasis supplied).

As with the asylum claim, the Board determined that

petitioner failed to establish statutory eligibility, in this

instance by failing to make out a prima facie case of

"extreme hardship."31 Gebremichael II, slip op. at 4-6. The

INS has considerable discretion to define "extreme hardship,"

INS v. Jong Ha Wang, 450 U.S. 139, 144-45 (1981) (per

curiam); Luna v. INS, 709 F.2d 126, 127 (1st Cir. 1983), and

to decide whether or not to reopen, Jong Ha Wang, 450 U.S. at

143 n.5; Luna, 709 F.2d at 127. Accordingly, we review for

abuse of discretion. Williams v. INS, 773 F.2d 8, 9 (1st

Cir. 1985); Luna, 709 F.2d at 127; Antoine-Dorcelli v. INS,

703 F.2d 19, 21 (1st Cir. 1983). In addition, as with any

motion to reopen, we must determine whether petitioner has

had a "fair opportunity to develop his side of the story."

Luna, 709 F.2d at 128. In making such a determination

without the benefit of facts developed at a hearing, "common

notions of fair play and substantial justice generally

31. Respondent concedes that petitioner has accrued seven
continuous years in the United States from his entry in 1985.
Respondent's Brief in No. 93-1486, at 8. Petitioner
presented evidence of his good moral character which was
neither challenged by the INS nor rejected by the Board.
Indeed, the INS granted petitioner's application for
voluntary departure, which requires proof of "good moral
character." 8 U.S.C. 1254(e)(1).

-30-
30

require that the Board [and, thus, the reviewing court]

accept as true the facts stated in an alien's affidavits."

See id. (quoting Reyes v. INS, 673 F.2d 1087, 1090 (9th Cir.

1982)).

Even assuming the truth of petitioner's

allegations, we find no error in the Board's determination.

The Board considered petitioner's allegations that he would

suffer hardship if separated from his family members living

in this country. Petitioner did not make any substantial

allegations about possible economic hardship save his concern

about abandoning a career in the United States. The Board

also considered the effect of past persecution and the

possibility of future persecution but, in line with its own

precedent, refused to attach great weight to such evidence in

deciding an application for suspension of deportation, which

is an alternative form of relief to asylum and withholding of

deportation.32 See Gebremichael II, slip op. at 5 (citing

In re Kojoory, 12 I. & N. Dec. 215 (BIA 1967)). In choosing

to discount evidence of persecution when calculating "extreme

32. Petitioner claims that since his detention in 1983, he
has suffered a range of psychological consequences:
nightmares; anxiety; depression; inability to trust others;
and periodic inability to concentrate. An affidavit from a
therapeutic social worker who met with petitioner several
times in June 1992, offers similar information. In addition,
the social worker opined that deporting petitioner "could
cause him permanent emotional scarring, whose potential
implications include suicide, harm to himself, and inability
to function."

-31-
31

hardship," the Board was within the limits of its discretion.

Accord Kashefi-Zihagh v. INS, 791 F.2d 708, 710 (9th Cir.

1986). Finally, any procedural error in the Board's taking

of administrative notice was harmless with respect to the

suspension application because the noticed facts were of

marginal relevance to the issue of "extreme hardship." As

the Board considered the relevant facts and factors, we do

not perceive an "unreasoned or arbitrary exercise of

discretion." Williams, 773 F.2d at 10 (quoting Rios-Pineda,

471 U.S. at 451).

IV.

CONCLUSION

For the foregoing reasons, the Board's initial

order as well as its subsequent order denying the motion to

reopen and reconsider are affirmed in part and vacated to the

extent that the Board failed to recognize petitioner's

eligibility for asylum as a social refugee. The matter is

remanded to the Board for a discretionary determination

whether petitioner, as a social refugee, is entitled to

asylum.

It is so ordered.

-32-
32